## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| MEAGHAN WALKER,<br>13 Wapiyapi Ave., Apt. 1B<br>Kyle, SD 57752<br><br>               Plaintiff,<br><br>v.<br><br>AMERICAN SOCIETY OF HEALTH-<br>SYSTEM PHARMACISTS, INC.;<br>4500 East West Highway, Suite 900<br>Bethesda, Maryland 20814<br>Montgomery County,<br><br>      Serve on:<br>      Registered Agent<br>      The Corporation Trust,<br>      Inc. 2405 York Road,<br>      Suite 201 Lutherville<br>      Timonium Maryland<br>      21093<br>      Baltimore County,<br><br>NATIONAL MATCHING SERVICES<br>INC.;<br>20 Holly Street, #301<br>Toronto, Ontario, Canada M4S 3B1,<br><br>INDIANA UNIVERSITY HEALTH;<br>340 West 10th Street<br>Indianapolis, IN 46206<br><br>ASCENSION HEALTH;<br>4600 Edmundson Rd<br>St. Louis, MO 63134,<br><br>      Serve on:<br>      Registered Agent:<br>      CSC-Lawyers Incorporating<br>      Service Company<br>      221 Bolivar St. | Case No.<br><br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Jefferson City, MO 65101

KAISER PERMANENTE;
1 Kaiser Plaza
Oakland, CA 94612,

    <u>Serve on:</u>
    Becky DeGeorge
    2710 Gateway Oaks Drive
    Sacramento, CA 95833,

NORTHWESTERN MEMORIAL
HOSPITAL;
251 East Huron Street
Chicago, IL 60611,

    <u>Serve on:</u>
    Registered Agent Julia K. Lynch
    211 E. Ontario Street, Suite 1800
    Chicago, IL 60611,

REGENTS OF THE UNIVERSITY OF
CALIFORNIA;
1111 Franklin St., 12th Floor,
Oakland, CA 94607,

RUSH UNIVERSITY MEDICAL
CENTER;
1653 West Congress Parkway
Chicago, IL 60612,

    <u>Serve on:</u>
    Registered Agent
    Carl Bergetz
    1700 W. Van Buren Street, Suite
    301
    Chicago, IL 60612,

THE CLEVELAND CLINIC
FOUNDATION, D/B/A CLEVELAND
CLINIC;
9500 Euclid Ave.
Cleveland, OH 44195,

<u>Serve on:</u>
Registered Agent
CT Corporation System
4400 Easton Commons Way,
Suite 125
Columbus, OH 43219

THE JOHNS HOPKINS HOSPITAL;
1800 Orleans Street
Baltimore, Maryland 21202,

<u>Serve on:</u>
CSC-Lawyers Incorporating
Service Company
7 St. Paul Street, Suite 820
Baltimore, MD 21202,

THE METHODIST HOSPITAL D/B/A
HOUSTON METHODIST HOSPITAL;
6565 Fannin Street
Houston, TX 77030,

<u>Serve on:</u>
Registered Agent
CT Corporation System
1999 Bryan Street, Suite 900
Dallas, TX 75201

THE NEW YORK AND
PRESBYTERIAN HOSPITAL D/B/A
NEW YORK PRESBYTERIAN
HOSPITAL;
525 East 68th Street
New York, NY 10021

<u>Serve on:</u>
New York Secretary of State
One Commerce Plaza
99 Washington Avenue
Albany, NY 12231,

THE UNIVERSITY OF CHICAGO
MEDICAL CENTER;
5841 South Maryland Avenue
Chicago, IL 60637

       <u>Serve on:</u>
       Registered Agent
       Rachel Spitz
       5841 South Maryland Avenue
       Chicago, IL 60637,

TRUSTEES OF THE UNIVERSITY OF
PENNSYLVANIA, D/B/A MEDICAL
CENTER-HOSPITAL OF THE
UNIVERSITY OF PENNSYLVANIA;
3451 Walnut Street, Room 310
Philadelphia, PA 19104

and

TRUSTEES OF THE UNIVERSITY OF
PENNSYLVANIA, D/B/A UPMC
PRESBYTERIAN SHADYSIDE;
200 Lothrop Street
Pittsburgh, PA 15312

       <u>Serve on:</u>
       J. Matthew Gilmore
       21 Prospect Sq.
       Cumberland, MD 21502,

              Defendants.

Plaintiff Meaghan Walker ("Plaintiff") brings this action individually and on behalf of all others similarly situated. Plaintiff seeks treble damages, injunctive relief, and other relief pursuant to the federal antitrust laws for the anticompetitive conduct alleged herein and demands a trial by jury on all matters so triable. In support of this Complaint, Plaintiff alleges as follows based on personal knowledge as to the facts pertaining to herself and based on information and belief as to all other matters.

## I.  <u>SUMMARY</u>

1.     Plaintiff brings this suit against Defendants for their unlawful contract, combination, or conspiracy to fix wages and exercise unlawful monopsony market power in the labor market for Pharmacy Residents.[1]

2.     Defendants are the American Society of Health-System Pharmacists ("ASHP"), the primary accrediting authority for pharmacy residency programs in the United States, who operates the ASHP Residency Matching Program ("ASHP Match") and promulgates rules and regulations for ASHP-accredited pharmacy residency programs; National Matching Services, Inc. ("National Matching Services"), the consulting company whose proprietary algorithm is used in the ASHP Match program and who provides other analytics to ASHP and participating programs in connection with ASHP Match; and schools and hospitals that operate ASHP-accredited pharmacy residency programs and who employ Pharmacy Residents (collectively "Employer Defendants").

---

[1] As defined herein, "Pharmacy Residents" are individuals who, after receiving a Doctor of Pharmacy degree (PharmD), participate in specialized training in residency programs, which are almost uniformly accredited by and operated in accordance with the rules and regulations promulgated by the American Society of Health-System Pharmacists.

1

3.      ASHP accreditation is functionally required for all pharmacy residency programs, and nearly all such programs are ASHP accredited. Similarly, all ASHP-accredited programs are required to utilize the ASHP Match program to select applicants for available residency positions. As described in detail *infra*, ASHP Match uses algorithmic "matching" to decide which applicants go to which programs – decisions to which the Employer Defendants are contractually obligated to abide – and thereby eliminate competition between the Employer Defendants for the most qualified applicants.

4.      Additionally, rules and regulations promulgated by ASHP – all of which are mandatory for ASHP-accredited programs – eliminate the ability for applicants to negotiate over terms of employment and salary, prohibits them from moving between employers, prohibits applying to residency programs outside of ASHP Match, and strictly polices when and how residents can perform compensated work outside of their residency program. The Employer Defendants are themselves prohibited from soliciting or accepting applications or for hiring pharmacy residents outside of ASHP Match.

5.      The result of this arrangement has the intention and effect of displacing competition in the recruitment, hiring, employment, and compensation of Pharmacy Residents.

6.      The anticompetitive agreements between ASHP and the Employer Defendants do not end there. As part of the ASHP Match, the Employer Defendants exchange competitively sensitive compensation information for pharmacy residents. Because applicant selection occurs simultaneously by the Employer Defendants on specific dates each year, this compensation information constitutes the type of information which

courts have cautioned holds "the greatest potential for generating anti-competitive effects."[2] In a competitive market, this kind of sensitive business information would encourage industry participants to increase their wages to attract the most in-demand applicants. Thus, it would be contrary to a firm's self-interest to share such information with competitors. In a cartel, however, access to this kind of information serves as reassurance that cartel members are adhering to the conspiracy and declining to create upward wage pressure.

7.    Finally, Defendants have conspired to artificially restrict the number of Pharmacy Resident positions below the number of applicants. Defendants accomplish this, *inter alia*, by exchanging competitively sensitive information on program capacity through the ASHP Match portal, industry surveys, and through myriad other opportunities to collude. The effect of this supply restraint is evident in the fact that despite a nationwide shortage of direct care pharmacists (one type of practice for which a pharmacists needs to complete a postgraduate residency program) and the concern expressed by many pharmacy and medical bodies about the stability of the direct care pharmacy workforce in coming years, the number of Pharmacy Residency positions offered by the Employer Defendants has remained well below the number of applicants - and in fact, the number of residencies offered from 2023 to 2024 *decreased* for the first time in over ten years. Defendants' concerted efforts to restrict the supply of Pharmacy Resident positions has further eroded

---

[2] *Todd v. Exxon Corp.*, 275 F.3d 191, 201 (2d Cir. 2011) (Sotomayor, J.) (quoting *United States v. United States Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978)).

any negotiating power Plaintiff and class members have to negotiate compensation to market rates.

8.      Beginning no later than March 31, 2021, Defendants conspired, colluded, and entered into an agreement to fix, artificially depress, standardize, and stabilize Pharmacy Resident compensation and other terms of employment. These agreements among Defendants and their co-conspirators make the Employer Defendants a buyer-side cartel: a group of competitors in the labor market agreeing to abide by horizontal pricing restraints to purposefully restrict competition in the labor market for Pharmacy Residents so they can collectively reduce their costs.

9.      The effect of this horizontal agreement was to fix and suppress salaries so as to make them unresponsive to a competitive marketplace. This amounts to an unlawful restraint under Section 1 of the Sherman Act, 15 U.S.C. § 1. Similarly, Defendants' exchange of competitively sensitive information had the effect of depriving the marketplace of independent centers of decision-making and suppressing wages, and therefore amounts to a separate and independent violation of Section 1 of the Sherman Act. Plaintiff brings this action for damages and injunctive relief on behalf of herself and class members.

## II.      JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, as this action arises out of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a), 26). This court further has

jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action in which the aggregate amount in controversy exceeds $5,000,000 and at least one member of the putative class is a citizen of a state different from that of one of the Defendants.

11.     Venue is proper in this District pursuant to Section 12 of the Clayton Act (28 U.S.C. § 22), and pursuant to 28 U.S.C. § 1391(b) and (c), because, at all times relevant to the Complaint, one or more of the Defendants resided in this District, and all Defendants transacted business, were found, or had agents in this District.

12.     This Court has personal jurisdiction over Defendants because they: (1) transacted business throughout the United States, including in this District; (2) have substantial contacts within the United States, including in this District; and/or (3) are engaged in an illegal anticompetitive scheme that was and is directed at, and had and has the intended effect of causing injury to, persons residing in, located in, and/or doing business in the United States, including in this District.

13.     Defendants' activities were intended to and did have a direct, substantial, and reasonably foreseeable effect on interstate commerce in the United States, including in this District. Defendants solicit and purchase pharmacy resident labor in the continuous and uninterrupted flow of interstate commerce, including in, into, and from this District.

### III.     PARTIES

#### A.     Plaintiff

14.     Meaghan Walker is a Doctor of Pharmacy who received her PharmD at the University of Utah in 2022. Plaintiff Walker participated in the ASHP Match including in 2023 when she was matched with Indiana University Health, located in Indianapolis,

Indiana, where she participated in a pharmacy residency. Her compensation for this position was approximately $49,000 per year.

### B.    Defendants

15.    Defendant American Society of Health-System Pharmacists, Inc. is a Maryland corporation with its principal office located at 4500 East-West Highway, Suite 900, Bethesda, Maryland 20814. ASHP is the primary accreditation body for pharmacy residency organizations in the United States. Organizations that are ASHP-accredited are required to follow policies and procedures promulgated by ASHP, including the use of ASHP Match for Pharmacy Resident applications. ASHP monitors Employer Defendants' and the co-conspirators' compliance with ASHP rules and regulations, including through regular audits.

16.    Defendant National Matching Services Inc. is a Canadian corporation incorporated in Ontario, Canada and with its principal office located at 20 Holly Street, Suite 301, Toronto, Ontario, Canada M4S 3B1. National Matching Services designed the algorithm utilized in ASHP Match and assists in operating ASHP Match. Additionally, National Matching Services provides analytics and other metrics to programs that participate in the ASHP Match, including ASHP, the Employer Defendants, and co-conspirators.

17.    Defendant Indiana University Health is an Indiana not-for-profit healthcare system with its principal office located at 340 West 10th Street, Indianapolis, Indiana 46206. Throughout the relevant time period, Indiana University Health was an ASHP-

accredited pharmacy residency program, participated in ASHP Match, entered into agreements to adopt and adhere to the rules promulgated by ASHP, including those related to ASHP Match, and hired Pharmacy Residents through ASHP Match. Plaintiff Walker was matched with Indiana University Health in 2023 and was employed as a PGY2 pharmacy resident from 2023 to 2024.

18.     Defendant Ascension Health Alliance is a Missouri not-for-profit corporation with its principal office located at 4600 Edmundson Rd., St. Louis, MO 63134. Throughout the relevant time period, Ascension Health Alliance was an ASHP-accredited pharmacy residency program, participated in ASHP Match, entered into agreements to adopt and adhere to the rules promulgated by ASHP, including those related to ASHP Match, and hired Pharmacy Residents through ASHP Match.

19.     Defendant Kaiser Permanente is a hospital and health network with its principal office located at 1 Kaiser Plaza, Oakland, CA 94612. Throughout the relevant time period, Kaiser Permanente operated several ASHP-accredited pharmacy residency programs, participated in ASHP Match, entered into agreements to adopt and adhere to the rules promulgated by ASHP, including those related to ASHP Match, and hired Pharmacy Residents through ASHP Match.

20.     Defendant Northwestern Memorial Hospital is an Illinois not-for-profit corporation with its principal office located at 251 East Huron Street, Chicago, IL 60611. Throughout the relevant time period, Northwestern Memorial Hospital operated an ASHP-accredited pharmacy residency program, participated in ASHP Match, entered into

7

agreements to adopt and adhere to the rules promulgated by ASHP, including those related to ASHP Match, and hired Pharmacy Residents through ASHP Match.

21.    Defendant Regents of the University of California is corporate entity created under the laws of the State of California and which is organized into many campuses, medical centers, and laboratories. Its principal office is located at 1111 Franklin St., 12th Floor, Oakland, CA 94607. Throughout the relevant time period, University of California operated several ASHP-accredited pharmacy residency programs, participated in ASHP Match, entered into agreements to adopt and adhere to the rules promulgated by ASHP, including those related to ASHP Match, and hired Pharmacy Residents through ASHP Match.

22.    Defendant Rush University Medical Center is an Illinois not-for-profit corporation with its principal office located at 1653 West Congress Parkway, Chicago, IL 60612. Throughout the relevant time period, Rush University Medical Center operated an ASHP-accredited pharmacy residency program, participated in ASHP Match, entered into agreements to adopt and adhere to the rules promulgated by ASHP, including those related to ASHP Match, and hired Pharmacy Residents through ASHP Match.

23.    Defendant The Cleveland Clinic Foundation d/b/a The Cleveland Clinic is an Ohio not-for-profit corporation with its principal office located at 9500 Euclid Ave., Cleveland, OH 44195. Throughout the relevant time period, The Cleveland Clinic operated several ASHP-accredited pharmacy residency program, participated in ASHP Match, entered into agreements to adopt and adhere to the rules promulgated by ASHP, including those related to ASHP Match, and hired Pharmacy Residents through ASHP Match.

24.    Defendant The Johns Hopkins Hospital is a Maryland not-for-profit corporation with its principal office located at 1800 Orleans Street, Baltimore, MD 21202. Throughout the relevant time period, The Johns Hopkins Hospital operated an ASHP-accredited pharmacy residency program, participated in ASHP Match, entered into agreements to adopt and adhere to the rules promulgated by ASHP, including those related to ASHP Match, and hired Pharmacy Residents through ASHP Match.

25.    Defendant The Methodist Hospital d/b/a Houston Methodist Hospital is a Texas not-for-profit corporation with its principal office located at 6565 Fannin Street, Houston, TX 77030. Throughout the relevant time period, Houston Methodist Hospital operated an ASHP-accredited pharmacy residency program, participated in ASHP Match, entered into agreements to adopt and adhere to the rules promulgated by ASHP, including those related to ASHP Match, and hired Pharmacy Residents through ASHP Match.

26.    Defendant The New York Presbyterian Hospital d/b/a New York Presbyterian Hospital is a New York not-for-profit corporation with its principal office located at 630 West 168th Street, New York, NY 10032. Throughout the relevant time period, New York Presbyterian Hospital operated an ASHP-accredited pharmacy residency program, participated in ASHP Match, entered into agreements to adopt and adhere to the rules promulgated by ASHP, including those related to ASHP Match, and hired Pharmacy Residents through ASHP Match.

27.    Defendant The University of Chicago Medical Center is an Illinois not-for-profit corporation with its principal office located at 5841 South Maryland Avenue, Chicago, IL 60637. Throughout the relevant time period, The University of Chicago

9

Medical Center operated an ASHP-accredited pharmacy residency program, participated in ASHP Match, entered into agreements to adopt and adhere to the rules promulgated by ASHP, including those related to ASHP Match, and hired Pharmacy Residents through ASHP Match.

28.     Defendant Trustees of the University of Pennsylvania d/b/a University of Pennsylvania Medical Center-Hospital of the University of Pennsylvania is a Pennsylvania corporation with its principal office located at 3451 Walnut Street, Room 310, Philadelphia, PA 19104. Throughout the relevant time period, University of Pennsylvania Medical Center-Hospital of the University of Pennsylvania operated an ASHP-accredited pharmacy residency program, participated in ASHP Match, entered into agreements to adopt and adhere to the rules promulgated by ASHP, including those related to ASHP Match, and hired Pharmacy Residents through ASHP Match.

29.     Defendant UPMC Presbyterian Shadyside is a Pennsylvania corporation with its principal office located at 200 Lothrop Street, Pittsburgh, PA 15212. Throughout the relevant time period, UPMC Presbyterian Shadyside operated an ASHP-accredited pharmacy residency program, participated in ASHP Match, entered into agreements to adopt and adhere to the rules promulgated by ASHP, including those related to ASHP Match, and hired Pharmacy Residents through ASHP Match.

C.     **Agents and Co-Conspirators**

30.     Defendants participated in the alleged conspiracy through the acts of their officers, directors, agents, partners, employees, representatives, affiliates, subsidiaries, and companies they acquired through mergers and acquisitions while they were actively

engaged in the management, direction, control or transaction of the corporation's business or affairs, and for whom they are liable.

31.     Various persons and entities that are not named as Defendants participated as co-conspirators in the violations alleged herein and have performed acts in furtherance thereof. These other entities have facilitated, adhered to, participated in, aided and abetted, and otherwise acted in concert with Defendants in order to advance the objectives of the scheme to benefit Defendants and themselves by artificially suppressing the price of Pharmacy Resident labor and restricting free and open competition for the same. Plaintiff reserves the right to name some or all of these entities as Defendants. Defendants are jointly and severally liable for the acts of their co-conspirators whether or not they are named as defendants in this litigation.

**IV.     <u>FACTUAL ALLEGATIONS</u>**

**A.     Pharmacists' Career Paths**

32.     A student seeking a career as a pharmacist usually attains a four-year bachelor's degree and then enrolls at one of nearly 150 U.S.-based colleges and schools of

pharmacy that offer a Doctor of Pharmacy Degree ("PharmD").[3] In 2023, there were over 44,000 such PharmD students enrolled in the United States.[4]

33.     In order to practice pharmacy, a graduate with a Doctor of Pharmacy must pass the North American Pharmacist Licensure Examination and any state pharmacy board licensure requirements.

34.     Students with a PharmD often find work as a pharmacist immediately after graduation in sectors such as retail (dispensing medicine at a CVS Pharmacy, for example) and manufacturing (working for pharmaceutical manufacturers in creating medicines). In 2023, the median wage for pharmacists was $134,790.[5]

35.     For many years, ASHP and other groups such as the American College of Clinical Pharmacy have advocated for increasing the presence of direct care pharmacists in hospitals and other treatment facilities, and for expanding the role those pharmacists play to more direct and hands-on involvement in patient treatment and wellness – which they argued decreased costs and increased quality of care. This kind of pharmacy practice is called "direct patient care," which includes administering immunizations, preventative

---

[3] American Association of Colleges of Pharmacy, *Academic Pharmacy's Vital Statistics*, available    at:    https://www.aacp.org/article/academic-pharmacys-vital-statistics    (last accessed March 8, 2025).
[4] *Id.*
[5] U.S. Bureau of Labor Statistics, *Occupational Employment and Wages, May 2023; 29-1051 Pharmacists*, available at https://www.bls.gov/oes/2023/may/oes291051.htm (last accessed March 8, 2025).

care services, medication management, and other services that are directly provided to a patient (as opposed to dispensing medication prescribed by a physician).[6]

36.     ASHP describes that "the practice of pharmacy transcends the prototypical example of the community pharmacist who fills prescriptions at the local drug store. Today, pharmacists in hospitals and ambulatory clinics work with physicians, nurses, and other providers on interprofessional teams to manage patients' medications and ensure appropriate care transitions."[7]

37.     In order to practice direct care—as well as other specialties such as solid organ transplantation, clinical pharmacogenomics, psychiatry, infectious diseases, critical care, cardiology, oncology, and pediatrics—a pharmacist must complete additional training and education through a residency program.

38.     Pharmacy residencies are programs in a defined area of pharmacy practice which can last one or two years. The different stages of a residency are described as Postgraduate Year 1 ("PGY-1") and Postgraduate Year 2 ("PGY-2"). A pharmacist can

---

[6] Academy of Managed Care Pharmacy, *Patient Care Seervices Provided by a Pharmacist*, available at: https://www.amcp.org/legislative-regulatory-position/patient-care-services-provided-pharmacist#:~:text=Pharmacists%20are%20equipped%20to%20provide,other%20direct %20patient%20care%20services (last accessed March 30, 2025).

[7] *Medical University Hospital Authority v. Azar, II.*, Case No,. 2:19-cv-1755-MBS (D.S.C., June 22, 2020), Brief of Amicus Curiae the American Society of Health System Pharmacists in Support of Plaintiff's Motion for Summary Judgment at 2 (available at https://www.ashp.org/-/media/assets/advocacy-issues/docs/GRD-ASHP-Amicus-Brief.pdf).

participate in either a PGY-1 program, after which they will be eligible for – although not required to complete – a PGY-2 program, or a combined PGY-1/2 program.

39.    Pharmacy Residency programs usually involve training in a hospital or similar treatment facility where residents work in "rotations," providing direct patient care under the supervision of a more senior pharmacist. Residents work notoriously long hours – so prevalent was this problem and the associated high rates of burn-out that the ASHP implemented new requirements for all accredited residency programs to impose "duty hour requirements" that cap total hours of work per week (80 hours per week), hours of continuous duty (16 hours), and require at least one period of 8 hours of "duty-free time" per seven days of duty.[8]

40.    Pharmacists who have completed residencies frequently find post-residency employment in a hospital or clinical setting, and employment in those settings typically requires residency experience. Pharmacists with residency training are also eligible to work as instructors – or "preceptors" – in pharmacy residencies.

41.    As detailed *infra*, the compensation for Pharmacy Residents – often described as a "stipend" – is substantially lower than the market value for their labor. The estimated 2024 salary for these graduate students, all of whom have received at least a four-year Doctor of Pharmacy degree, most of whom have both a PharmD and a four-year

---

[8] *See* American Society of Health-System Pharmacists, *Duty Hour Requirements for Pharmacy Residencies*, available at: https://www.ashp.org/-/media/assets/professional-development/residencies/docs/duty-hour-requirements.ashx (last accessed March 30, 2025).

bachelor's degree, and who work in specialized positions providing direct care to patients, was advertised as being between $40,000 and $60,000.[9]

**B.    ASHP Regulations and Influence on Residency Programs**

42.    ASHP is the primary accrediting body for pharmacy residency programs and published the first criteria for the pharmacy residency programs in 1962. ASHP describes that "[a]ccreditation of pharmacy residencies is currently provided exclusively by ASHP," and there are no other alternative accrediting bodies – any program that does not apply for and receive ASHP accreditation is simply considered "unaccredited."[10]

43.    For decades, ASHP and other professional organizations have advocated for the expansion of the role of pharmacists in direct patient care. However, ASHP argued that direct care pharmacists' four-year PharmD degrees were insufficient to prepare these pharmacists for direct patient care. One of ASHP's primary concerns was that employers would need to provide additional training – at their own expense – before the new pharmacists were capable of performing all of their job duties. In order to address both concerns, ASHP advocated that all direct care pharmacists must participate in a postgraduate residency program, which would shift the cost of paying the pharmacists while they achieved on-the-job training away from the employer.

---

[9] American Pharmacists Association, *Overview of Pharmacy Residency and Fellowship Training*, available at: https://cdn.pharmacist.com/CDN/PDFS/20454%20-%20Overview%20of%20Pharmacy%20Res%20and%20Fellow%20Training_PDF_FIN.pdf (last accessed March 30, 2025).

[10] American Society of Health-System Pharmacists, *How to Start a Residency Program*, available at: https://www.ashp.org/-/media/assets/professional-development/residencies/docs/how-to-start-residency-what-you-really-need-to-know.pdf (last accessed March 30, 2025).

44.     In 2006, the American College of Clinical Pharmacy ("ACCP") declared that they and the ASHP "have worked together to advance the principle that accredited residency training should be a requirement for clinical practitioners."[11] To this end, ASHP and the ACCP called for all pharmacists involved in the provision of direct patient care to have residency training by 2020.[12]

45.     In order to meet this goal, ASHP was actively involved in industry-wide efforts to expand pharmacy residencies. The ACCP initially announced that they and ASHP "would pursue collaboration to increase the number of residencies, in keeping with ACCP's strategic objectives to increase 'the total number of accredited residency positions . . . to 3000.'"[13] In the following years, the ASHP met with other pharmacy organizations, hospitals, and residency program directors to discuss strategies to expand residency programs to meet the projected need for direct care pharmacists by 2020. In 2019, ASHP wrote that, based on the number of pharmacy school graduates and the demand for direct care pharmacists, "[h]ealth systems must consistently increase slots to ensure that residency training for direct patient care in health systems is attainable in 2020."[14]

---

[11] American College of Clinical Pharmacy, *American College of Clinical Pharmacy's Vision of the Future: Postgraduate Pharmacy Residency Training as a Prerequisite for Direct Patient Care Practice*, PHARMACOTHERAPY 2006; 26(5):722-733, available at: https://www.accp.com/docs/positions/positionStatements/paper013.pdf (last accessed March 30, 2025).

[12] *See* American Society of Health-System Pharmacists, *Pharmacy Forecast 2019: Strategic Planning Advice for Pharmacy Departments in Hospitals and Health Systems*, 76 Am. J. Health-Syst. Pharm. 2:76 (January 15, 2019).

[13] *See supra* note 11.

[14] *Supra* note 12.

46.     From the inception of ASHP's plan to require all direct care pharmacists to attain residency training, Defendants have expressed concern over the cost of compensation paid to Pharmacy Residents. In 2010, the ACCP published an article analyzing a sample budget for a residency program, writing:

> Administrators may find the costs (e.g., salary [$42,000], fringe benefits, travel, accreditation, preceptor time and training) incurred in the conduct of residency training daunting, but when the overall value proposition of residency training to the organization is analyzed, the perspective may shift substantially. Residents are licensed pharmacists who represent the potential to facility capacity building in virtually any departmental or organizational effort, **and they generally do so at a dramatically reduced cost to the organization.**[15]

47.     In 2015, a collection of pharmacy residency directors including from Defendants Rush University Medical Center and University of Chicago, authored an article which noted that "[a] frequently referenced problem for initiating new or expanding current programs is cost" which includes "the resident's salary, benefits, [and] travel money."[16] Some suggestions to offset the cost of the resident's salary by utilizing them in revenue-generating work, such as "provid[ing] order verification, dispensing, and clinical services on weekends" as well as "assist[ing] with order verification and dispensing during the evening and overnight shifts" because "resident hours do not have to be limited to Monday through Friday day shifts." The article speculated that stringent application of the ASHP

---

[15] Kelly Smith et al., *Value of Conducting Pharmacy Residency Training – the Organizational Perspective*, PHARMACOTHERAPY 30(12):490e-510e (2010) (emphasis added).
[16] Melanie J. Engels, et al., *Overcoming the pharmacy residency capacity challenge as 2020 draws near*, 7 CURRENTS IN PHARMACY TEACHING AND LEARNING 405-410 (2015).

accreditation standards may "prevent institutions from using pharmacy residents as merely 'cheap pharmacist labor.'"[17]

48.    In 2016, ASHP Senior Vice President Kasey Thompson published a letter to the Department of Labor opposing a proposed rule which would effectively create a salary floor for Pharmacy Residents, writing:

> The proposed rule by the DOL would require many postdoctoral training programs, such as pharmacy residencies, to establish a salary floor for the residents at $50,440 or require that residents be paid overtime when they exceed the eight-hour workday. ASHP is concerned that the rule does not allow for flexibility, nor does it provide an incremental timetable for these salary increases. Given the current climate of scarce resources, we believe that such increases must be phased in over a period of time to allow pharmacy departments to plan for future budgetary expenditures. By not taking a phased-in approach, we risk a reduction in the number of residency positions that can be offered by hospitals and clinics and, in turn, jeopardize the capacity needed for postdoctoral training in a period of increased demand for the patient care services of pharmacists.[18]

49.    In a 2015 guide titled "How to Start a Residency Program," ASHP advertises the cost savings associated with using pharmacy residents as cheap labor, stating that "[s]plitting one pharmacist position into two residency positions will usually yield leftover dollars."[19]

50.    As detailed herein, ASHP has exercised its position as industry rulemaker and enforcer to effectuate a multifaceted conspiracy to suppress competition in the market

---

[17] *Id.*

[18] American Society of Health-System Pharmacists, *ASHP Urges Caution on DOL Overtime Rule-1*, available at https://www.ashp.org/advocacy-and-issues/key-issues/other-issues/additional-advocacy-efforts/ashp-urges-caution-on-dol-overtime-rule-1?loginreturnUrl=SSOCheckOnly#:~:text=The%20proposed%20rule%20by%20the,exceed%20the%20eight%2Dhour%20workday. (last accessed March 30, 2025).

[19] *Supra* note 10.

for Pharmacy Resident labor to allow the Employer Defendants and co-conspirators to extract maximum value from Plaintiff and class members at minimum cost.

51.     Absent the wage-fixing conspiracy alleged herein, these Pharmacy Residents would be compensated at the market rate and commensurate with their co-workers – such as the non-direct-care pharmacists working at the same hospital, whose work Plaintiff and class members are frequently required to perform for no additional compensation as a cost-offsetting measure for the residency program – or at a bare minimum, at the rate required by state and federal wage-and-hour laws.

## C.     ASHP Resident Matching Program

52.     Pharmacists who wish to apply for a residency position do so through the ASHP Resident Matching Program ("ASHP Match").

53.     ASHP Match is a program operated by ASHP and Defendant National Matching Services, which is described by the latter:

> Pharmacy residency positions beginning in 2025 in postgraduate year one (PGY1) or postgraduate year two (PGY2) pharmacy residency programs are offered to applicants through the ASHP Resident Matching Program (the "Match"). The Match provides an orderly process to help applicants obtain positions in residency programs of their choice, and to help programs obtain applicants of their choice. Similar matching programs are in use in many other health professions, including medicine, dentistry, psychology, podiatry, optometry, and others.
>
> The American Society of Health-System Pharmacists (ASHP) is responsible for establishing the Rules of the Match, and for monitoring the implementation of the Match. The administration and conduct of the Match is carried out by National Matching Services Inc. on behalf of ASHP.[20]

---

[20] National Matching Services Inc., *Overview of the Match: Introduction*, available at: https://natmatch.com/ashprmp/overview.html (last accessed March 30, 2025).

54.     National Matching Services has administered ASHP Match in partnership with ASHP since at least 2016.

55.     ASHP Match is operated based on a proprietary algorithm created by National Matching Services.

56.     ASHP Match works by processing preference lists, or "rankings," of applicants and employers.

### 1.    Rules for Residency Programs

57.     Pharmacy residency programs must register on a website operated by National Matching Services.[21] In order to register for the ASHP Match, residency programs must agree to be bound by rules created, implemented, and monitored by ASHP.

58.     ASHP requires that all accredited pharmacy residency programs use ASHP Match. The only exception to this rule is for certain residencies operated by the Indian Health Service and those that offer positions exclusively to commissioned pharmacy officers of the Department of Defense or the Public Health Service. Pharmacy residencies offered outside of ASHP Match constitute less than ten percent of all pharmacy residencies offered in the United States in every year relevant to this action.

59.     Specifically, pharmacy residency programs are required to adopt and adhere to the ASHP Regulations on Accreditation of Pharmacy Residency ("ASHP Accreditation Regulations") in order to receive and maintain ASHP accreditation.[22]

---

[21] *See* National Matching Services Inc., *ASHP Resident Matching Program*, available at https://natmatch.com/ashprmp (last accessed March 30, 2025).

[22] The ASHP Accreditation Regulations adopted on April 15, 2021 are available at:

60.    In relevant part, the ASHP Accreditation Regulations require that "[a]ll postgraduate year one and postgraduate year two residency programs . . . must participate in the Resident Matching Program conducted by ASHP" unless exempted, as discussed *supra*.[23] The ASHP Accreditation Regulations state that accreditation may be withdrawn from any ASHP-accredited program that is "required to participate in the Resident Matching Program and fails to do so."[24]

61.    The ASHP Accreditation Regulations also require all programs to adhere to the ASHP Resident Matching Program Residency Agreement ("ASHP Match Residency Agreement")[25] and Rules for the ASHP Pharmacy Residency Matching Program ("ASHP Match Rules"),[26] as well as to use PhORCAS and a residency program management system called PharmAcademic for its application process.

---

https://web.archive.org/web/20211005173334/https://www.ashp.org/-/media/assets/professional-development/residencies/docs/accreditation-regulations-residencies.pdf (archived October 5, 2021 by the Wayback Machine). These regulations were revised and approved again on August 12, 2023 and September 20, 2024. The provisions of these regulations were substantively and materially the same at all times relevant to this Complaint.

[23] ASHP Accreditation Regulations VIII.E.

[24] *Id.* XII.A.5.

[25] The operative ASHP Residency Agreement to which Plaintiff Walker was required to adhere is available at https://web.archive.org/web/20211024222736/https://natmatch.com/ashprmp/documents/progterms.pdf (archived on October 24, 2021 by the Wayback Machine). The provisions of this agreement were substantively and materially the same at all times relevant to this Complaint.

[26] The operative ASHP Match Rules to which Plaintiff Walker was required to adhere is available at https://web.archive.org/web/20210925161610/https://natmatch.com/ashprmp/documents/ashpmatchrules.pdf (archived on September 25, 2021 by the Wayback Machine). The provisions of these rules were substantively and materially the same at all times relevant to this Complaint.

62.     The ASHP Match Rules provide, *inter alia*:

2. "Pharmacy residency programs in the United States must offer all of their positions through the RMP [ASHP Match]" with exceptions as described *supra*.

2(b). "All positions with funding secured by the Rank Order List (ROL) submission deadline for Phase I of the match must be offered in Phase I of the Match."

4. "Participants in the RMP [ASHP Match], including applicants and programs, may not communicate, solicit, accept, or use any ranking-related information pertaining to either Phase of the Match prior to the release of the results for Phase II of the Match."

4(c). "Residency program personnel and applicants may never solicit information regarding applicants' and programs' rankings, even after release of Match results."

5. "Results of the RMP [ASHP Match] constitute binding agreements between applicants and residency programs that may not be reversed unilaterally by either party."

7(a). "Applicants who match to a position in Phase I are not eligible to participate in Phase II."

7(c). "Residencies with positions that are offered in Phase II of the Match may not take any actions to fill these positions prior to the release of the Phase I Match results. Applicants who do not obtain a position in Phase I of the Match, along with other individuals acting on their behalf, may not contact residency programs about available positions in Phase II prior to the release of the Phase I Match results."

8(b). "Residency program personnel may not take any actions to fill open positions prior to release of the results from Phase II of the Match. Applicants who remain unmatched may not contact residency programs about unfilled positions prior to release of the Phase II Match results."

8(d). "Applicants may not accept an offer if they have been matched or have already accepted an offer from another residency program."

1(d). "Violations of these rules or Match agreements by applicants or programs may result in sanctions by ASHP or legal action by other Match participants."

63.     The ASHP Match Residency Agreement provides, *inter alia*, that all programs participating in the ASHP must:

2. "Abide by the Rules of the ASHP Pharmacy Resident Matching Program ("ASHP Match Rules")."

4. "Offer in Phase I of the match all positions available in the residency" except for exempted positions, and "[f]urthermore, positions left unfilled in Phase I of the Match must be offered in Phase II of the Match, in accordance with ASHP Match Rules."

5. "Provide complete and accurate information for applicants prior to the Rank Order List deadline for each Phase of the Match concerning the position(s) offered in the Match, including all organizational, residency and program policies related to eligibility requirements for appointment."

7. "Require no commitment from any applicant and make no offer of appointment to any applicant prior to the release of the results for Phase I of the Match, except for PGY2 residency positions that may be committed to PGY1 residents in accordance with the Early Commitment Process. Furthermore, require no commitment from any applicant and make no offer of appointment to any applicant prior to the release of the results for Phase II of the Match for any position that is offered in Phase I but not filled in Phase I or that is added for Phase II of the Match."

8. "Offer an appointment to each applicant matched with this residency."

10. "Not offer a position to any applicant who was matched elsewhere, or committed elsewhere through the Early Commitment Process, and who has not received a written release from the residency program concerned."

The ASHP Match Residency Agreement also states:

> **ASHP possesses beneficiary standing to enforce this Agreement, and violations of the terms of this Agreement or the ASHP Match Rules will be reported to ASHP.** If this organization or residency violates any of the terms of this Agreement or the ASHP Match Rules, such as not offering an appointment to an applicant who has matched with the residency, or offering an appointment to an applicant who has matched to another residency, ASHP may pursue all available remedies and impose penalties on this organization, residency and/or program(s), including forfeiture of ASHP accreditation status.

(emphasis in original).

64.    Each Employer Defendant and co-conspirator agreed to the terms of the ASHP Match Program Agreement in every year that it has participated in the ASHP Match.

In order to list its program on the ASHP Match Directory, the Employer Defendants and their co-conspirators needed to login to a website operated by National Matching Services.

65. Once registered, the residency programs review applications and submit a list of their desired applicants in numerical order of preference.

### 2. Rules for Applicants

66. In order to register for the ASHP Match, applicants must agree to be bound by rules created, implemented, and monitored by ASHP. Specifically, applicants agree to be bound by the ASHP Match Rules, described *supra*, and the ASHP Resident Matching Program Applicant Agreement ("ASHP Match Applicant Agreement.").[27] The ASHP Match Applicant Agreement requires in relevant part that the applicant agrees:

1. To abide by the ASHP Pharmacy Resident Matching Program.

. . .

4. Not to make any commitment to or contract with any program registered for the Match prior to the release of the results for Phase I of the Match, except that if I am currently a PGY1 resident I may commit to a PGY2 residency position that is offered to me in accordance with the Early Commitment Process. Furthermore, if I do not obtain a position in Phase I of the Match or through the Early Commitment Process, I agree not to make any commitment to or contract with any program registered for the Match prior to the release of the results of Phase II of the Match. If I choose to accept a position either at a program that is not registered for the Match or at a registered program in accordance with the Early Commitment Process, or if I decide not to participate in the Match for any other reason, then I will submit

---

[27] The operative ASHP Applicant Agreement to which Plaintiff Walker was required to adhere is available at https://web.archive.org/web/20211024222736/https://natmatch.com/ashprmp/documents/progterms.pdf (archived on November 12, 2020, by the Wayback Machine). The provisions of this agreement were substantively and materially the same at all times relevant to this Complaint.

a withdrawal from the Match, and will not submit a Rank Order List for the Match.

5. To accept appointment to the program with which I am matched. I cannot avoid accepting appointment to or attending the program with which I am matched without a written release from the program concerned; also, another program registered for the Match cannot offer me a position unless I have this release.

The ASHP Match Applicant Agreement further requires the applicant to agree to not share ranking information, request ranking information from a residency program, or disclose "the positioning of any applicant or program on a Rank Order List" prior to the release of Phase II Match results.

67.    The ASHP Match Applicant Agreement also states:

**I understand that ASHP possesses beneficiary standing to enforce this Agreement, and violations of the terms of this Agreement or the ASHP Match Rules will be reported to ASHP.** If I violate any of the terms of this Agreement or the ASHP Match Rules, such as refusing to accept a position at the program with which I have been matched, ASHP may pursue all available remedies, including reporting my actions to my school. Furthermore, ASHP may impose penalties on me, including barring me from participation in future ASHP Resident Matching Programs.

(emphasis in original).

68.    Applicants participate in the ASHP Match by submitting written materials such as resumes, letters of recommendation, transcripts, etc., as well as a list of their desired residency programs in numerical order of preference. Plaintiff and class members submit these materials through an ASHP-operated portal called the Pharmacy Online Residency Centralized Application Service ("PhORCAS").

69.    ASHP hosts an annual residency showcase which invites program directors from all accredited pharmacy residency programs to set up booths and meet applicants.

Applicants are nonetheless forbidden from applying directly to the program and must submit their applications through ASHP Match.

70.     Based on the preferences submitted by applicants and employers, the ASHP Match "applies a fair, transparent, and unbiased algorithm to place applicants into positions."[28]



*Figure 1. Demonstration of Match Placement Process created by National Matching Services*[29]

71.     The results of the ASHP Match are contractually binding on applicants and residency programs.

---

[28]   National Matching Services Inc., *How the Process Works,* available at: https://natmatch.com/matchingprogram.html (last accessed March 30, 2025).
[29] *Id.*

72.    ASHP imposes penalties on applicants or residency programs that violate the terms of their participation in ASHP Match, including applicants or residency programs that do not accept the placements that are generated by the program. Such penalties include prohibiting the applicant from re-applying through ASHP Match.

73.    The ASHP Match program achieves its intended purpose of displacing a free and competitive market and substituting a centralized, anticompetitive allocation system assigning Plaintiff and class members to a single, specific and mandatory residency position. The effect has been to fix, depress, standardize, and stabilize compensation for Pharmacy Residents well below market rates.

**D.    Exchange of Pharmacy Resident Compensation Information through ASHP Match, Industry Surveys, and Other Means**

74.    Defendants further effectuate their conspiracy through the illegal sharing of competitively sensitive information on Pharmacy Resident wages, benefits, and other compensation information.

75.    ASHP maintains a "Residency Directory" which contains Resident Compensation for every ASHP-accredited pharmacy residency program.[30] This includes resident salary (referred to as a "stipend") and other benefits. Through this directory, the Employer Defendants and co-conspirators have a single, consolidated source of information on their competitors' prices, which allows all participants to avoid the price

---

[30] American Society of Health-System Pharmacists, *Residency Directory*, available at: https://accreditation.ashp.org/directory/?_gl=1*17xgopz*_gcl_au*NjA2NDM5OTY2LjE 3NDExMTEwNTU.*_ga*MTEwMTQ0NjY3OS4xNzQxMTExMDU1*_ga_5WL5JPM7 T0*MTc0MTQ3NTQ3Ni4xMi4wLjE3NDE0NzU0NzYuNjAuMC4w#/program/residenc y (last accessed March 30, 2025).

competition that would occur in a competitive marketplace where participants are unaware of the salaries and other benefits being offered by their competitors.

76.     Additionally, the Employer Defendants and co-conspirators are provided with competitively sensitive analytics from National Matching Systems, through which they are able to compare their program with their Co-Defendants and co-conspirators. National Matching Systems describes these as "Competitiveness Reports" which "provide programs with insights into their desirability, the quality of their applicant pool, and the effectiveness of their evaluations. The reports are customized for each program and provide comparisons to a peer group and the overall market."[31]

77.     ASHP also regularly conducts surveys of residency programs which it shares externally. In the ASHP Accreditation Regulations, all programs are required to "adhere to the following mandatory surveys conducted by the McCreadie Group, Inc., on behalf of the ASHP and delivered through PharmAcademic™."[32] One of the surveys, the "Annual Residency Accreditation Report" is

> designed to identify substantive program, organization, or staff changes that may signal the program is in non-compliance with accreditation standards, needs assistance, or requires further review. Completion of the annual report provides ASHP with important information on the status of programs in relation to their performance and quality. **Additionally, some information collected is aggregated to identify trends and shared with the pharmacy community and external agencies/partners**.[33]

---

[31]     National     Matching     Services     Inc.,     *Recent*     News,     available     at: https://natmatch.com/news.html (last accessed March 30, 2025).

[32] *See supra* note 27 at Section XI(f).

[33] *Id.* at XI(f)(1).

78.    One of the primary ways that ASHP communicates with the "pharmacy community and external agencies/partners" is through the Pharmacy Forecast newsletter – an annual survey conducted by the ASHP of pharmacy leaders "written to identify and contextualize emerging trends that will influence healthcare, health systems, and the pharmacy profession" and "provides recommendations to inform strategic planning that should prompt action by pharmacists and health-system leaders."[34]

79.    Finally, Defendants and co-conspirators had the opportunity to collude at myriad industry events. For example, ASHP hosts an annual Residency Program Design and Conduct Workshop which brings together residency program directors to discuss "the design and conduct of a pharmacy residency program."[35] Upon information and belief, Employer Defendants and co-conspirators attended these programs.

80.    ASHP also hosts annual meetings such as the ASHP Midyear Clinical Meeting and the National Pharmacy Preceptors Conference.

81.    Government guidelines prohibit Defendants' conduct. The "Guidelines for Collaborations Among Competitors" issued in 2000 by the United States Department of Justice ("DOJ") and the Federal Trade Commission ("FTC") provide:

> Agreements that facilitate collusion sometimes involve the exchange or disclosure of information. . . . [I]n some cases, the sharing of information related to a market in which the collaboration operates or in which the participants are actual or potential competitors may increase the likelihood

---

[34] *See* American Society of Health-System Pharmacists, *Pharmacy Forecast 2025: Strategic Planning Advice for Pharmacy Departments in Hospitals and Health Systems*, 2 Am. J. Health-Syst. Pharm. 82:17-47 (January 15, 2025).

[35] American Society of Health-System Pharmacists, *Residency Program Design and Conduct Virtual Workshops,* available at *https*://www.ashp.org/meetings-and-conferences/rpdc?loginreturnUrl=SSOCheckOnly (last accessed April 15, 2025).

of collusion on matters such as price, output, or other competitively sensitive variables. The competitive concern depends on the nature of the information shared. Other things being equal, the sharing of information relating to price, output, costs, or strategic planning is more likely to raise competitive concern than the sharing of information relating to less competitively sensitive variables.[36]

82.     A decade later, in 2010, the United States submitted the following comments to the Organization for Economic Cooperation and Development on the legal approach to information sharing among competitors:

> [C]ertain information exchanges among competitors may violate Section 1 of the Sherman Act, which prohibits a "contract, combination . . . or conspiracy" that unreasonably restrains trade. The antitrust concern is that information exchanges may facilitate anticompetitive harm by advancing competing sellers' ability either to collude or to tacitly coordinate in a manner that lessens competition. Thus, for example, exchanges on price may lead to illegal price coordination.[37]

83.     Four years later, in 2014, the FTC issued general guidance entitled "Information exchange: be reasonable," confirming that "when competing companies seek market intelligence by exchanging price or other commercially sensitive information, that may facilitate collusion or otherwise harm competition and consumers in violation of the antitrust laws."[38]

---

[36] Roundtable on Joint Ventures, Note by the US Federal Trade Commission and the US Department of Justice, 15–16 (Oct. 9, 2000) ,https://www.ftc.gov/system/files/attachments/us-submissions-oecd-other-international-competition-fora-2000-2009/2000-rdtble_on_joint_ventures_ftc_doj.pdf.

[37] OECD, Information Exchanges Between Competitors under Competition Law 294 (2010), https://www.academia.edu/79222152/Information_Exchanges_Between_Competitors_under_Competition_Law (last visited April 13, 2024).

[38] Micheal Bloom, *Information exchange: be reasonable*, FTC (Dec. 11, 2014), https://www.ftc.gov/enforcement/competition-matters/2014/12/information-exchange-be-reasonable (last visited April 13, 2024).

84.     In 2023, Doha Mekki, the Principal Deputy Assistant Attorney General for the DOJ's Antitrust Division noted that "exchanges facilitated by intermediaries can have the same anticompetitive effect as direct exchange among competitors."[39]

E.     **Defendants' Anticompetitive Manipulation of Offered and Filled Residency Positions**

85.     In addition to the ASHP Match and exchange of compensation information, Defendants and co-conspirators effectuated their conspiracy through a concerted scheme to manipulate annual number of residencies that were offered and filled.

86.     In the past ten years, as postgraduate pharmacy residency programs became more ubiquitous throughout the industry, ASHP became worried that the supply of pharmacy residencies might meet or exceed the number of applicants, which would increase the costs for Employer Defendants and the co-conspirators by, for the first time, creating a seller-side market. Although true competition for pharmacy resident labor would continue to be stifled by operation of the ASHP Match, supply of residencies exceeding demand would likely result in upward wage pressure as residency programs would be at an increased risk being left with unfilled residencies. In superseding previous policy positions, ASHP endorsed a policy "[t]o oppose expansion of enrollment in existing or new colleges of pharmacy unless well-designed projections demonstrate that such enrollment

---

[39] *Principal Deputy Assistant Attorney General Doha Mekki of the Antitrust Division Delivers Remarks at GCR Live: Law Leaders Global 2023*, DOJ, OFFICE OF PUBLIC AFFAIRS (Feb. 2, 2023), https://www.justice.gov/opa/speech/principal-deputy-assistant-attorney-general-doha-mekki-antitrust-division-delivers-0. These remarks were made during a discussion of the healthcare industry but are equally applicable to other industries.

increases are necessary to maintain a viable pharmacist workforce."[40] The rationale of this policy position was explained the following way:

> The Council discussed the mismatch between pharmacy workforce supply and demand. Demand far exceeded supply in 2000, but growth in colleges and other factors now have supply exceeding demand. The Council discussed how there could be better planning to avoid these situations, both of which are costly to the health care system and present risks to quality and patient care. It was suggested that well-designed workforce projections might be useful in determining the need for new or expanded educational capacity.

87.    ASHP's avowed endorsement of a policy of keeping the number residency positions below the number of applicants has been followed zealously by the Employer Defendants and co-conspirators. This has resulted in a phenomenon whereby the number of available residency positions has stubbornly remained well-below supply of applicants, regardless of external market factors.

88.    This has been empirically documented. In 2023, an article in the American Journal of Pharmaceutical Education reported:

> In 2019, a majority of American Society of Health-System Pharmacists (ASHP) Pharmacy Forecast Panelists predicted that nearly all health-systems would require a postgraduate year 1 (PGY1) residency for entry-level pharmacist positions. Despite these endorsements, as well as the declines in residency applications and unmatched applicants since 2020, there remains an annual surplus of graduates seeking PGY1 residency training compared to positions available within the ASHP Resident Matching Program.[41]

---

[40] ASHP Policy Positions 2009-2019 (with Rationales): Education and Training, 1108: Quality of Pharmacy Education and Expansion of Colleges of Pharmacy, https://www.ashp.org/-/media/assets/policy-guidelines/docs/policy-positions/policy-positions-education-training.pdf (last accessed April 15, 2025).
[41] Christina L. Mnatzaganian et al., *Influence on the Number, Timing, and Types of Advanced Pharmacy Practice Experiences on Residency Matching*, 87 AM. J. OF PHARM. ED. (2023).

89.     Similarly, a 2022 article in the American Journal of Health-System Pharmacy analyzed trends in pharmacy residencies and wrote:

> Required residency training for direct patient care has been persistently predicted by various pharmacy organizations since 2006. ASHP-accredited PGY2 program growth rates appear slower than predicted, as the number of available positions do not match the number of applicants. In 2021, 25% of PGY2 residency applicants participating in the match did not obtain a position. While residency training is often preferred in direct patient care settings, it is not always a requirement for practice. Before residency training becomes a standard prerequisite, the number of available PGY2 residency programs will need to grow to match the number of applicants.[42]

90.     Defendants carry out this element of the conspiracy in part through the ASHP Match, which requires participants to list on the Residency Directory the number of residency positions it has available. This is a key competitive metric that allows Defendants to anticipate total industry volume of residency positions and ensure that number does not exceed projected applications.

91.     Additionally, Defendants are able to coordinate through ASHP signaling. For example, in 2021 the ASHP Forecast reported:

> Workforce outlook and educational debt have decreased admission applications and class size in schools and colleges of pharmacy. During the past 15 years, the historical pharmacist shortage has transitioned into oversupply.

> The number of pharmacy graduates will decline in the next 5 years, which may recalibrate supply and demand. Alignment with the number of graduates with residency availability could accelerate **ASHP's goal to ensure new pharmacy practitioners complete post-graduate training as a minimum credential**.[43]

---

[42] Drew Lambert et al., *Trends in postgraduate year 2 pharmacy residencies*, AM. J. HEALTH-SYST. PHARM. 2022;79:1369-1375.

[43] American Society of Health-System Pharmacists, *Pharmacy Forecast 2021: Strategic*

92.    A competitive market for Pharmacy Resident labor would react to the shortage of direct care pharmacists by taking steps to recruit qualified applicants to fill available positions and/or expand the number of available positions. However, any residency program that did so would risk disrupting the balance of supply and demand in the market that deprives applicants of bargaining power and allows the industry writ large to pay their Pharmacy Residents below-market wages.

**F.    Relevant Market and Market Power**

93.    Because horizontal restraints like the one alleged herein involve agreements among competitors not to compete and to instead fix wages and make them unresponsive to a competitive marketplace, they are *per se* unlawful under the Sherman Act.[44] Thus, judgment may be entered against Defendants for the illegal conduct described herein without defining the particular market that Defendants' conduct has harmed or establishing Defendants' power in that market.

94.    Horizontal agreements not to compete in terms of price or wages, like the agreement alleged here, are also properly condemned under "quick look" review, which obviates the need to define the particular market power that Defendants' conduct has harmed and obviates the need to establish Defendants' power in that market.

---

*Planning Guidance for Pharmacy Departments in Hospitals and Health Systems*, 78 Am. J. Health-Syst. Pharm. 6:497 (March 15, 2021) (emphasis added).

[44] This relates to Plaintiffs' Section 1 claim for conspiracy to fix prices. Plaintiffs' independent Section 1 claim for conspiracy to exchange competitively sensitive information is properly evaluated under a Rule of Reason framework.

95.    Notwithstanding the foregoing, the markets that are relevant to the illegal conduct described in this Complaint are properly defined herein.

96.    The Relevant Labor Market is the market for employment of Pharmacy Residents. Each of the Employer Defendants and co-conspirators are buyers in the Relevant Labor Market. Plaintiff and class members are sellers in the Relevant Labor Market.

97.    Defendants and co-conspirators have the power to restrain Pharmacy Resident compensation. In doing so, they do not meaningfully risk diminishing their market dominance. ASHP-accredited programs are the only programs where pharmacists can complete residency training required to practice pharmacy in direct care settings such as hospitals and ambulatory care facilities. ASHP itself recognizes the non-substitutability of any other training program for pharmacists seeking to work in direct care positions by campaigning for residency training to be a prerequisite for any pharmacist working in these positions.

98.    Non-accredited programs are not reasonably comparable: in addition to non-ASHP-accredited programs making up less than 10% of all pharmacy residency programs in the United States, non-accredited pharmacy residency programs are less desirable to pharmacy students than accredited residency programs. Additionally, training at an accredited pharmacy residency program is more desirable to post-residency employers than training at a non-accredited residency.

99.    Pharmacy residency programs are also not reasonably comparable to fellowships. As described *supra,* residency training is a prerequisite for certain kinds of pharmacy practice, and a fellowship is not a substitute for residency training. The APhA

describes a pharmacy fellowship as "postdoctoral training with an emphasis in pharmacy-based research and/or education," and lists possible post-fellowship employment opportunities such as clinical researcher, clinical or tenure track faculty, and policy and advocacy pharmacist.[45] These are a different category of jobs than those available to pharmacists who complete a residency, which include ambulatory care pharmacist, acute care pharmacist, and managed care pharmacist.[46]

100.    Defendants and co-conspirators could impose a small but significant and non-transitory reduction in the compensation below market rates for Pharmacy Residents without concern about losing a critical mass of residents to employment opportunities elsewhere. Indeed, Defendants *have* fixed the price for Plaintiff's and class members' labor at a rate that is less than half of what they could make by foregoing residency training. The fact that Pharmacy Residents continue to apply for residency positions in the Relevant Labor Market despite the dramatically lower compensation compared to jobs in other labor markets, such as commercial pharmacist, demonstrates that the Relevant Labor Market is distinct.

101.    This market is national in scope. The agreement here affects all ASHP-accredited pharmacy residency programs, which exist across the country. The accreditation standards for pharmacy residency programs, including the mandatory use of ASHP Match, is uniformly applied to all pharmacy residency programs across the country.

---

[45] *Supra* note 9.

[46] *Id.*

102.    Additionally, pharmacy applicants frequently apply for programs in diverse geographical locations. Upon receiving a match, Pharmacy Residents frequently move across the country and between states to perform their employment.

103.    As described *supra,* fewer than 10% of all pharmacy residency programs did not participate in ASHP Match. Upon information and belief, those programs accounted for fewer than 100 total positions, compared with the over 5,000 positions offered exclusively through ASHP Match. This demonstrates that Defendants and co-conspirators have monopsony power in the Relevant Labor Market.

## V.    <u>ANTICOMPETITIVE EFFECTS</u>

104.    Since at least 2016, Defendants and co-conspirators have repeatedly collectively acted to ratify and uphold the ASHP rules and regulations that suppress and fix the wages of Pharmacy Residents. This conduct results in a restraint on price competition in the Relevant Labor Market between and among Employer Defendants and co-conspirators for Pharmacy Resident labor, which has had and continues to have a substantially adverse effect on competition in the labor market for Pharmacy Residents.

105.    Because horizontal restraints like the one alleged here involve agreements between competitors not to compete, competitive harm can be presumed and judgment may be entered against Defendants for the illegal conduct described in this Complaint without examining the restraint's impact on the market. In the alternative, the wage-fixing conspiracy violates the Sherman Act under "quick look" review or full "rule of reason" analysis, because it restrains trade without any procompetitive justification, or any

37

theoretical pro-competitive justifications are outweighed by the Rule's anticompetitive effects or could be achieved by less competition-restricting means.

106.    The conduct alleged herein has anticompetitive effects, including the following:

  a)    Price competition in the market for Pharmacy Resident labor has been restrained or eliminated;

  b)    Prices for Pharmacy Resident labor have been suppressed, fixed, maintained, or stabilized at artificially low, noncompetitive levels throughout the United States;

  c)    Pharmacy Residents have been deprived of free and open competition;

  d)    Pharmacy Residents have been deprived of the opportunity to freely negotiate with Employer Defendants and co-conspirators for services; and

  e)    Pharmacy Residents have received artificially suppressed wages for their labor.

107.    The wage-fixing conspiracy does not have pro-competitive justifications. As described herein, the conspiracy does not result in an increase in either available pharmacy residency positions relative to applications, nor a relative increase in the number of available positions that get filled. Neither does the conspiracy result in an overall increase in pharmacists with residency training entering the workforce. In any event, a hypothetical desire to increase the number of residency-trained pharmacists does not justify fixing compensation for Pharmacy Residents at a level dramatically below market rate.

108.    In fact, the wage-fixing conspiracy works at cross-purposes with a desire for residency programs to attract top talent and to train qualified individuals to become direct care pharmacists. In a world without Defendants' anticompetitive restraints, programs

would be free to directly recruit and entertain applicants, in part by offering more competitive compensation. Without fixing Pharmacy Residents' wages such that applicants must take a substantial pay cut in order to continue their training, Defendants would no doubt attract more applicants and be able to address the shortage of direct care pharmacists.

109.   Similarly, the conspiracy to exchange competitively sensitive information among and between Defendants and co-conspirators has the same anticompetitive effects described *supra* and does not have pro-competitive justifications.

110.   The purpose of Defendants' and their co-conspirators' conduct is to suppress, fix, maintain, or stabilize the price of Pharmacy Resident Labor at artificially low, noncompetitive levels throughout the United States and, as a direct and foreseeable result, Plaintiff and class members were paid artificially low, noncompetitive wages for their labor.

111.   By reason of the alleged violations of the antitrust laws, Plaintiff and class members have sustained injury to their businesses or property, having received lower compensation for their labor than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and as a result, they have suffered damages.

112.   This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## VI.   <u>CONTINUING VIOLATION</u>

113.   The violations of the Sherman Act described herein are ongoing and continuous.

114.    Throughout the relevant time period, Defendants have renewed their agreements to be bound by the ASHP Accreditation Regulations. ASHP accreditation is valid for eight years, at which point the residency program's accreditation needs to be renewed. Furthermore, ASHP considers "evaluation of accredited residency programs as a continuous process" and requires residency program directors to submit periodic status reports and an annual residency accreditation report so that ASHP can ensure ongoing compliance.[47] Thus, by participating in the continuing accreditation process, Defendants have continued their violations as described herein.

115.    Additionally, Defendants commit ongoing violations when ASHP adopts new operative Accreditation Regulations. As described *supra*, revised ASHP Accreditation Regulations were issued in April 15, 2021, August 12, 2023, and September 20, 2024. ASHP Accreditation Regulations provide that "In the event that The Standard is revised, all accredited programs will be expected to meet the revised standard within one year."[48]

116.    The Employer Defendants and co-conspirators further renewed their agreement to exchange competitively-sensitive information every year that they have participated in the ASHP Match.

## VII.    INTERSTATE COMMERCE

117.    Defendants' activities, including activities related to their illegal contract, combination, and conspiracy to restrain competition in the recruitment, hiring, employment

---

[47] Regulation VIII.A.
[48] Regulation XII.A.1.

and compensation of Pharmacy Residents, are in the flow of, and substantially affect, interstate commerce.

118.   Among other things, in connection with the ASHP Match, the exchange of competitively sensitive compensation information, and the manipulation of supply of residency positions, Defendants communicate with each other and/or their professional organizations and/or with prospective Pharmacy Residents across state lines using interstate telecommunications networks, the internet, and the United States mail. Defendants also induce prospective Pharmacy Residents to cross state lines to interview for and accept employment positions. Defendants also obtain millions of dollars in payments and funding from out-of-state sources, purchase millions of dollars of goods and services from out-of-state sources, and provide millions of dollars in services to patients crossing state lines to receive such services.

## VIII.   CLASS ACTION ALLEGATIONS

119.   Plaintiff brings this action individually and as a class action under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), seeking treble damages, injunctive relief, and other relief pursuant to federal antitrust laws on behalf of the members of the following class:

> All persons who, from March 31, 2021 to the date of class certification, obtained employment as a Pharmacy Resident through the ASHP Match.

> Specifically excluded from this Class are Defendants; their officers, directors, or employees; any entity in which a Defendant has a controlling interest; any affiliate, legal representative, heir, or assign of a Defendant; any federal, state, or local governmental entities; any judicial officers presiding over this action and members of their immediate family and staff; and any juror assigned to this action.

120.    Plaintiff reserves the right to amend this Class definition, including, without limitation, the Class Period.

121.    <u>Class Identity</u>: The above-defined Class members are readily identifiable from information and records in the possession of Defendants.

122.    <u>Numerosity</u>: Plaintiff does not know the exact number of class members because such information is presently in the exclusive control of the Defendants. Plaintiff believes that due to the nature of the trade and commerce involved, there are thousands of class members geographically dispersed throughout the United States, such that joinder of all class members would be impracticable.

123.    <u>Typicality</u>: Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff was employed by an Employer Defendant and was damaged by the same common course of wrongful conduct.

124.    <u>Common Questions Predominate</u>: There are questions of law and fact common to the Class, which predominate over any questions affecting only individual class members, including, but not limited to:

A.    Whether Defendants and their co-conspirators engaged in a contract, combination, or conspiracy to suppress, fix, maintain, or stabilize prices of Pharmacy Resident labor sold in interstate commerce in the United States in violation of federal antitrust laws;

B.    Whether Defendants agreed to unreasonably restrain trade in violation of federal antitrust laws.

C. Whether Defendants' conduct caused Plaintiff and class members to earn less than what they would have in a truly competitive market

D. Whether Defendants' conduct caused Plaintiff and class members to earn less than what they would have absent the restraint, including under federal and state wage-and-hour laws;

E. The identity of the participants of the alleged conspiracy;

F. The scope and duration of the alleged conspiracy;

G. The acts performed by Defendants and their co-conspirators in furtherance of the alleged conspiracy;

H. Whether Plaintiff and other members of the Class are entitled to, among other things, injunctive relief and if so, the nature and extent of such injunctive relief; and

I. The appropriate class-wide measure of damages.

125.  <u>Adequacy:</u> Plaintiff will fairly and adequately protect the interests of the Class in that Plaintiff's interests are aligned with, and not antagonistic to, those of other members of the Class and Plaintiff has retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent itself and the Class.

126.  <u>Superiority:</u> A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all members of the Class is impractical and class members do not have interests in individually controlling the prosecution of separate actions. Prosecution as a class action will eliminate the possibility of duplicative litigation. The damages suffered by individual members of the Class

compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the Class to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and the establishment of incompatible standards of conduct for Defendants and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economies of scale, and comprehensive supervision by a single court.

127.    Injunctive Relief: Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

## IX.    CLAIMS FOR RELIEF

### COUNT 1 - Violation of Section 1 of the Sherman Act
### Agreements in Restraint of Trade
### (15 U.S.C. § 1)

128.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

129.    Defendants and co-conspirators entered into and engaged in unlawful agreements in restraint of the trade and commerce described above. These actions violated and continue to violate Section 1 of the Sherman Act, 15 U.S.C. § 1. Since at least four years before the filing of this action, the Defendants' cartel has restrained trade and commerce in violation of Section 1 of the Sherman Act, and the behavior and its consequences continue today.

130.    This combination and conspiracy by Defendants (which possess a dominant position in the relevant market) has resulted in, and will until restrained continue to result in, anti-competitive effects, including *inter alia*: (a) fixing the compensation of Plaintiff and class members at an artificially low level; and (b) eliminating or suppressing, to a substantial degree, competition among Employer Defendants for skilled labor in the market.

131.    As a direct and proximate result of Defendants' contract, combination, and conspiracy to restrain trade, suppress salaries, and eliminate competition for skilled labor, Plaintiff and class members have suffered injury to their property and have been deprived of the benefits of free and fair competition on the merits. Absent the conspiracy, Plaintiff and class members would have received higher compensation commensurate with their experience, education, and the value of the labor, or at a minimum the wages required to be paid by federal and/or state wage-and-hour laws.

132.    As a result, Plaintiff and class members have suffered damages in an amount to be proved at trial.

133.    Defendants' agreements and conspiratorial acts were authorized, ordered, or done by their respective officers, directors, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

134.    Defendants' agreements, combinations, and/or conspiracies violate Section 1 of the Sherman Act, whether under a *per se*, "quick look," or "rule of reason" analysis.

135.    Plaintiff and class members seek three times their damages caused by Defendant's violations of Section 1 of the Sherman Act, the costs of bringing suit, reasonable attorneys' fees, and a permanent injunction enjoining Defendant from ever again entering into similar agreements in violation of Section 1 of the Sherman Act.

## COUNT 2 – Violation of Section 1 of the Sherman Act
## Exchange of Competitively Sensitive Information
## (15 U.S.C. § 1)

136.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

137.    Defendants and co-conspirators entered into and engaged in unlawful agreements in restraint of the trade and commerce described above. These actions violated and continue to violate Section 1 of the Sherman Act, 15 U.S.C. § 1. Since at least four years before the filing of this action, the Defendant's cartel has restrained trade and commerce in violation of Section 1 of the Sherman Act, and the behavior and its consequences continue today.

138.    In furtherance of this scheme, Defendants and co-conspirators have agreed between and among themselves to exchange competitively sensitive information such as Resident Compensation Information.

139.    Defendants' information exchange has had the intended anti-competitive effects, including *inter alia*: (a) fixing the compensation of Plaintiff and class members at an artificially low level; and (b) eliminating or suppressing, to a substantial degree, competition among Employer Defendants for skilled labor in the market.

140.    Defendants' agreement, combination, and/or conspiracy to exchange competitively sensitive information violates Section 1 of the Sherman Act under either a "quick look," or "rule of reason" analysis because the exchange results in the described anticompetitive effects with no valid procompetitive justifications. Any proffered procompetitive justifications do not outweigh the anticompetitive effects and could have been reasonably achieved through means less restrictive of competition.

141.    Each Defendant and co-conspirator has participated in one or more overt acts in furtherance of the information exchange.

142.    As a direct and proximate result of Defendants' contract, combination, and conspiracy to exchange competitively sensitive information, Plaintiff and class members have suffered injury to their property and have been deprived of the benefits of free and fair competition on the merits. Absent the conspiracy to exchange competitively sensitive information, Plaintiff and class members would have received higher compensation commensurate with their experience, education, and the value of the labor, or at a minimum the wages required to be paid by federal and/or state wage-and-hour laws.

143.    Plaintiff and class members seek three times their damages caused by Defendant's violations of Section 1 of the Sherman Act, the costs of bringing suit, reasonable attorneys' fees, and a permanent injunction enjoining Defendant from ever again entering into similar agreements in violation of Section 1 of the Sherman Act.

## X.    REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, respectfully requests judgment against Defendants, as follows:

A.    That the Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representative and its counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B.    That the unlawful contract, combination, or conspiracy alleged herein be adjudged and decreed in violation of Sections 1 of the Sherman Act;

C.    That Plaintiff and the Class recover damages to the maximum extent allowed under federal law, and that a joint and several judgment in their favor be entered against Defendants in an amount to be trebled to the extent such laws permit;

D.    That Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the contract, combination, or conspiracy alleged herein, or from entering into any other contract, combination, or conspiracy having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

E.    That Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or

claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of a company's information;

F.      That Plaintiff and the Class be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

G.      That Plaintiff and the Class recover their costs of suit, including reasonable attorneys' fees, expenses, and costs as provided by law; and

H.      That Plaintiff and the Class have such other and further relief as the case may require and the Court may deem just and proper.

## XI.    DEMAND FOR JURY TRIAL

Plaintiff, individually and on behalf of the Class, hereby requests a jury trial pursuant to Federal Rule Civil Procedure 38(b) on any and all claims so triable.

Dated: 4/21/2025

/s/ _____

Nicholas A. Migliaccio
(Maryland Federal Bar No. 29077)
Jason S. Rathod
(Maryland Federal Bar No. 18424)
**MIGLIACCIO & RATHOD LLP**
412 H St., NE
Suite 302
Washington, DC 20002
Tel.: (202) 470-3520
Fax: (202) 800-2730
nmigliaccio@classlawdc.com
jrathod@classlawdc.com

49

Daniel E. Gustafson
Michelle J. Looby
Anthony J. Stauber
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 So. Sixth Street, Suite 2600
Minneapolis, MN 55402
Tel: (612) 333-8844
Fax: (612) 339-6622
dgustafson@gustafsongluek.com
mlooby@gustafsongluek.com
tstauber@gustafsongluek.com

Christopher V. Le
**BOIESBATTIN LLP**
4041 University Drive, 5th Floor
Fairfax, VA 22030
Tel: (703) 764-8700
Fax: (703) 764-8704
cle@boiesbattin.com

*Counsel for Plaintiff and the Proposed Class*