# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| ALEXIS ALBERT, *et al*.; and<br><br>MEAGHAN WALKER,<br>13 Wapiyapi Ave., Apt. 1B<br>Kyle, SD 57752,<br><br>*individually and on behalf of all others*<br>*similarly situated*,<br><br>       Plaintiffs,<br>v.<br><br>AMERICAN SOCIETY OF HEALTH-<br>SYSTEM PHARMACISTS, INC., *et al*.; and<br><br>INDIANA UNIVERSITY HEALTH, INC.<br>340 West 10th Street<br>Indianapolis, IN 46206,<br><br>KAISER FOUNDATION HEALTH PLAN,<br>INC.<br>One Kaiser Plaza<br>Oakland, CA 94612,<br><br>DAVID RUBIN, M.D., MSCE, IN HIS<br>OFFICIAL CAPACITY AS EXECUTIVE<br>VICE PRESIDENT OF UNIVERSITY OF<br>CALIFORNIA HEALTH, THE REGENTS OF<br>THE UNIVERSITY OF CALIFORNIA<br>1111 Franklin St., 12th Floor<br>Oakland, CA 94607,<br><br>       Defendants. | CIVIL ACTION NO. 8:25-cv-00673-LKG<br><br>**CONSOLIDATED CLASS ACTION<br>COMPLAINT**<br><br>Hon. Lydia Kay Griggsby<br><br>(JURY TRIAL DEMANDED) |

On behalf of themselves and all others similarly situated, Plaintiffs Alexis Albert, May Ann Hudgins, June Kim, and Meaghan Walker complain and allege as follows based on personal knowledge as to themselves, the investigation of their counsel, and information and belief as to all other matters.  Plaintiffs believe that substantial evidentiary support will exist for the allegations in this complaint, after a reasonable opportunity for discovery.

## NATURE OF THE CASE

1.    Competition for labor is a foundational premise of the free market economy.  It allows working people to compare offers between prospective employers, negotiate improved terms of employment, and change jobs when better opportunities arise.

2.    Plaintiffs are former pharmacy residents who bring this suit against Defendants for their unlawful conspiracy to restrain competition for and suppress wages and other compensation paid to pharmacy residents.

3.    Defendants are the American Society of Health-System Pharmacists ("ASHP"), which accredits pharmacy residency programs, operates the ASHP Residency Matching Program ("ASHP Match") and promulgates rules and regulations for ASHP-accredited pharmacy residency programs; National Matching Services, Inc. ("NMS"), the consulting company whose proprietary algorithm is used in the ASHP Match program; and the institutions that operate ASHP-accredited pharmacy residency programs and who employ pharmacy residents (the "Employer Defendants," as identified in ¶34 below).

4.    Collectively, Defendants have subverted the system of free competition in the labor market for resident pharmacists by designing, implementing, and agreeing to participate in the ASHP Match.  Instead of competing to hire resident pharmacists and allowing these individuals to negotiate better terms of employment and move between employers as they wish, Defendants have

forced all pharmacy residents to apply for employment through the ASHP Match—a system which suppresses competition through the imposition and enforcement of rules and regulations which eliminate a competitive marketplace.

5.      ASHP accreditation is functionally required for all pharmacy residency programs, and nearly all such programs are ASHP-accredited.  And all ASHP-accredited programs are required to exclusively use the ASHP Match program to hire pharmacy residents.  The ASHP Match uses algorithmic "matching" to decide which applicants go to which programs, effectively displacing competition in the hiring and employment of pharmacy residents.

6.      Rules and regulations applicable to the ASHP Match eliminate competition in the hiring or employment of pharmacy residents.  These rules prohibit applicants from negotiating the terms of their employment (including their compensation), preclude pharmacy residents from moving between employers, and bar them from applying to residency programs outside of the ASHP Match program.  The Employer Defendants are further prohibited from soliciting or accepting applications or from hiring pharmacy residents outside of ASHP Match.  These rules are enforced by banning applicants, residents and employers who violate them from participating in the ASHP Match—effectively freezing them out of the market for pharmacy residencies.

7.      Further, the employers participating in the ASHP Match have conspired to suppress the compensation of pharmacy residents by exchanging competitively sensitive compensation information regarding residents' salaries and employment benefits.  Defendants' and their co-conspirators' exchange of competitively sensitive information has the effect of depriving Plaintiffs and Class members of the benefits of free and fair competition, including competitive wages.

8.      Finally, these same entities conspire to suppress the compensation of pharmacy residents by agreeing to control the number of pharmacy residency positions available in any given year to ensure that the number of positions remains well below the total number of applicants.

9.      As a result of this anticompetitive conspiracy, generations of pharmacy residents have suffered from artificially suppressed wages and employment benefits and have been unable to improve their working conditions.  The effects of Defendants' conspiratorial conduct are clear: the median wages of pharmacy residents are substantially less than even the bottom 10% of pharmacist wages, as shown below.

**Figure 1. ASHP Median Wage v. 10th Percentile of All Pharmacist Wages[1]**



10.      The antitrust laws prohibit what Defendants have done.  These laws prohibit agreements in restraint of trade and provide remedies to redress violations, including treble damages and injunctive relief.  *See* 15 U.S.C. §§15, 26.  Plaintiffs bring this action to redress and put a stop to this illegal conspiracy in restraint of trade.

---

[1]      U.S. Bureau of Labor Statistics, Occupational Employment and Wage Statistics (OEWS) Tables, https://www.bls.gov/oes/tables.htm; ASHP Data.

## PARTIES

### I.    Plaintiffs

11.    Plaintiff Alexis Albert is a natural person and a resident of Lacey, Washington. Plaintiff Albert was employed as a pharmacy resident, through the ASHP Match, by Defendant UF Health Central Florida beginning in June 2023.  Ms. Albert's annual salary during her pharmacy residency with UF Health Central Florida was $47,985.60.

12.    Plaintiff May Ann Hudgins is a natural person and a resident of Ewa Beach, Hawaii. Plaintiff Hudgins was employed as a pharmacy resident, through the ASHP Match, by Defendant Queen's Health System beginning in July 2023.  Ms. Hudgins's annual salary during her pharmacy residency with Queen's Health System was $50,000.

13.    Plaintiff June Kim is a natural person and a resident of Herndon, Virginia.  Plaintiff Kim was employed as a pharmacy resident, through the ASHP Match, by Defendant Nemours Foundation at the Nemours Children's Hospital, Delaware, beginning on or about June 13, 2022. Ms. Kim's annual salary during her residency was $54,000.

14.    Plaintiff Meaghan Walker is a natural person and a resident of Kyle, South Dakota. Plaintiff Walker was employed as a pharmacy resident, through the ASHP Match, by Indiana University Health, beginning in July 2023.  Ms. Walker's annual salary during her residency with Indiana University Health was $50,980.80.

### II.    Defendants

15.    Defendant American Society of Health-System Pharmacists, Inc. is a professional organization that represents pharmacists.  Defendant ASHP is a Maryland corporation with its principal office at 4500 East-West Highway, Suite 900, Bethesda, MD 20814.  Defendant ASHP has nearly 60,000 members, including pharmacists in every state and the District of Columbia.

Defendant ASHP sponsors, administers, and operates the ASHP Match, and is responsible for establishing the rules of the ASHP Match and monitoring its implementation.

16.    Defendant National Matching Services Inc. is a Canadian business corporation.  It is incorporated in Ontario, Canada with its principal office at 20 Holly Street, Suite 301, Toronto, Ontario, Canada M4S 3B1.  Defendant NMS assists in the administration of the ASHP Match on behalf of Defendant ASHP and Employer Defendants.

17.    Defendant Allegheny Health Network, d/b/a Allegheny General Hospital ("AGH") is a Pennsylvania not-for-profit corporation, and its principal office is located at 120 Fifth Avenue, Suite 2900, Pittsburgh, PA 15222.

18.    Defendant Ascension Health Alliance ("Ascension") is a Missouri corporation, and its principal office is located at 4600 Edmundson Road St. Louis, MO 63134.  Defendant Ascension operates healthcare facilities in 19 states, including Maryland, and Washington D.C.

19.    Defendant The Cleveland Clinic Foundation, d/b/a The Cleveland Clinic ("Cleveland Clinic") is an Ohio nonprofit corporation, and its principal office is located at 9500 Euclid Avenue, Cleveland, OH 44195.

20.    Defendant The Johns Hopkins Hospital ("Johns Hopkins") is a Maryland corporation, and its principal office is located at 1800 Orleans Street, Baltimore, MD 21202.

21.    Defendant Indiana University Health, Inc. ("IUH") is an Indiana not-for-profit healthcare system, with its principal office located at 340 West 10th Street, Indianapolis, IN 46206.

22.    Defendant Kaiser Foundation Health Plan, Inc. ("Kaiser") is a California not-for-profit corporation, with its principal office located at One Kaiser Plaza, Oakland, CA 94612. Defendant Kaiser operates hospitals, pharmacies, and medical offices in eight states, including Maryland. and Washington D.C.  Its wholly-owned subsidiaries include Kaiser Foundation Health

Plan of Colorado, Kaiser Foundation Health Plan of Georgia, Inc., Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc., and Kaiser Foundation Health Plan of Washington, which upon information and belief, control facilities where Kaiser-employed pharmacy residents work.

23.     Defendant Leesburg Regional Medical Center, Inc. d/b/a UF Health Central Florida ("UF Health Central Florida") is a Florida not-for-profit corporation, and its principal office is located at 600 E. Dixie Avenue, Leesburg, FL 34748.

24.     Defendant The Methodist Hospital d/b/a Houston Methodist Hospital ("Houston Methodist") is a Texas corporation, and its principal office is located at 6565 Fannin Street, Houston, TX 77030.

25.     Defendant The Nemours Foundation ("Nemours") is a Florida not-for-profit corporation, and its principal office is located at 10140 Centurion Parkway North, Jacksonville, FL 32256.   Nemours operates the Nemours Children's Hospital, Delaware, located at 1600 Rockland, Wilmington, DE 19803.

26.     Defendant The New York and Presbyterian Hospital d/b/a New York Presbyterian Hospital ("New York Presbyterian") is a New York not-for-profit corporation, and its principal office is located at 630 West 168th Street, New York, New York 10032.

27.     Defendant Northwestern Memorial Hospital ("Northwestern") is an Illinois not-for-profit corporation, and its principal office is located at 251 East Huron Street, Chicago, IL 60611.

28.     Defendant Rush University Medical Center ("Rush") is an Illinois not-for-profit corporation, and its principal office is located at 1653 West Congress Parkway, Chicago, IL 60612.

29.     Defendant David Rubin, M.D., MSCE, in his official capacity as Executive Vice President of University of California Health, The Regents of the University of California ("UC Health").   Defendant Rubin maintains his principal office at 1111 Franklin Street, 12th Floor,

Oakland, CA 94607.  Upon information and belief, Defendant Rubin oversees the operation of all

UC Health system centers, including the following institutions that participate in the ASHP Match:

University of California Davis Medical Center, University of California Irvine Medical Center,

University of California, San Diego Health, and University of California, San Francisco.

30.     Defendant The University of Chicago Medical Center ("UCMC") is an Illinois not-

for-profit corporation, and its principal office is located at 5841 South Maryland Avenue, Chicago,

IL 60637.

31.     Defendant Trustees of the University of Pennsylvania, d/b/a University of

Pennsylvania Medical Center-Hospital of the University of Pennsylvania ("Hospital of the

University of Pennsylvania") is a Pennsylvania corporation, and its principal office is located at

3451 Walnut Street, Room 310, Philadelphia, PA 19104.

32.     Defendant UPMC Presbyterian Shadyside ("UPMC Presbyterian") is a

Pennsylvania corporation, and its principal office is located at 200 Lothrop Street, Pittsburgh, PA

15212.

33.     Defendant The Queen's Health Systems ("Queen's Health Systems") is a Hawaii

nonprofit corporation.  Its principal office address is 1301 Punchbowl Street, Honolulu, HI 96813.

34.     Defendants AGH, Ascension, Cleveland Clinic, Johns Hopkins, IUH, Kaiser, UF

Health Central Florida, Houston Methodist, Nemours, New York Presbyterian, Northwestern,

Rush, UC Health, UCMC, Hospital of the University of Pennsylvania, UPMC Presbyterian, and

Queens Health Systems, and are referred to throughout this Complaint as the "Employer

Defendants."  Throughout the relevant period, each Employer Defendant (and, in the case of UC

Health, with Dr. Rubin acting on behalf of UC Health in his official oversight capacity) has

participated, and continues to participate, in the ASHP Match, entered into agreements to adhere

to rules of the ASHP Match, hired pharmacy residents through the ASHP Match, and entered into agreements to exchange competitively-sensitive pharmacy resident compensation information, and entered into agreements to control the number of pharmacy residency positions.

35.     Various other institutions and individuals, known and unknown to Plaintiffs at this time, participated as co-conspirators in the acts complained of, performed acts, and made statements that aided, abetted, and furthered the unlawful conduct alleged in this Complaint.

## JURISDICTION AND VENUE

36.     Plaintiffs bring this action pursuant to 15 U.S.C. §§15 and 26, to obtain injunctive relief to put a stop to and to recover damages to redress the injuries sustained by the named Plaintiffs and the members of the Class as a result of Defendants' violations of 15 U.S.C. §1, as alleged herein.

37.     The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C §§1331 and 1337.

38.     Personal jurisdiction exists over all Defendants pursuant to 15 U.S.C. §22, and Maryland's long-arm statute, Md. Code, Cts. & Jud. Pro. §6-103.

39.     Venue is proper in this District pursuant to 15 U.S.C. §22, and 28 U.S.C. §§1391(b) and (c).  Each of the Defendants maintains offices, has representatives, may be found, and/or transacts business within this District within the meaning of 15 U.S.C. §22.  A substantial portion of the interstate trade and commerce described below has been carried out in this District.

40.     Additionally, personal jurisdiction exists as to each Defendant and venue is proper in this District because:

    a.  Defendant ASHP organizes events and conferences attended by one or more of the Employer Defendants—including the Midyear Clinical Meeting (which includes the Personnel Placement Services, "pharmacy's largest in-person job

fair"[2]), the Residency Showcase, the Residency Program Design and Conduct Workshops, and the National Pharmacy Preceptors Conference—in several states and invites individuals, including prospective pharmacy residents, from across state lines to attend these events and conferences. Defendant ASHP has members in all fifty states and accredits residency programs in nearly every state, including Maryland. Defendant ASHP accepts and sends payments via interstate wires, distributes published materials in hard copy and over the internet in every or nearly every state, and employs individuals in multiple states, including Maryland.

b.  Defendant NMS transacts business in the United States, including across state lines. Defendant NMS operates matching programs under contract with professional associations located in various states, including Maryland. Those matching programs accept applicants and employer programs from every state. Defendant NMS sends personnel to each of those various states to transact business with its clients. Defendant NMS accepts and sends payments via interstate wires and distributes published materials over the internet in every or nearly every state, including Maryland, including application fees from the Plaintiffs and Class members.

c.  Each Employer Defendant transacts business across state lines, including through the purchase, sale, and delivery of goods and services across state lines; employment of individuals in different states, including Maryland; and contracting with businesses located in different states. Upon information and belief, each Employer Defendant induces prospective pharmacy residents, including those residing in Maryland and this District, to cross state lines to interview for and accept employment positions.

d.  All Employer Defendants are required to be accredited to participate in the ASHP Match. As part of the accreditation process, Employer Defendants are required to certify and recertify their accreditation. The Review and Recertification Reward Program Agreement contains language stating that "This Agreement shall be deemed to be a contract made under the laws of the State of Maryland, and for all purposes shall be governed, interpreted, and enforced in accordance with the laws of the State of Maryland, without giving effect to any choice or conflict of law provision or rule (either of the State of Maryland or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Maryland."[3] Further, if "any claim or controversy related to this Agreement is not resolved pursuant to mediation, then such dispute or controversy shall be settled by binding arbitration in the city of Bethesda, Maryland . . . ."[4]

---

[2]      Am. Soc'y of Health-System Pharmacists, *Midyear Clinical Meeting*, https://midyear.ashp.org/pps-candidates?loginreturnUrl=SSOCheckOnly.

[3]      Am. Soc'y of Health-System Pharmacists, *Review and Recertification Reward Program Agreement*, (Sept. 30, 2024), https://www.ashp.org/products-and-services/review-and-recertification-reward-program/review-and-recertification-reward-program-agreement#.

[4]      *Id.*

e.  Each of the Employer Defendants applied for accreditation of their pharmacy residency programs by submitting application materials to Defendant ASHP's headquarters in Bethesda, Maryland. Defendant ASHP accredited all of the Employer Defendants' pharmacy residency programs from its headquarters in Bethesda, Maryland.

f.  ASHP meetings and events have specific terms and conditions ("Terms"). The Terms govern participation in any ASHP owned and operated in-person or virtual meeting or event. All participants must abide by the Terms to participate in any ASHP event. The Terms' "Miscellaneous" section dictates that the laws of Maryland govern the Terms.[5] The Terms govern events including the ASHP Midyear Clinical Meeting, the National Pharmacy Preceptors Conference and the Career Fair. Upon information and belief, Defendants and their representatives attended ASHP events subject to such Terms.[6]

g.  Personal jurisdiction and venue are also proper in this District because each Defendant illegally contracts, combines, and conspires with persons and entities that have committed, and continue to commit, overt acts within this District in furtherance of the illegal contract, combination, and conspiracy alleged in this Complaint.

## FACTUAL ALLEGATIONS

### I.  Pharmacists' Education and Employment

41.  A student seeking a career as a pharmacist usually attains a four-year bachelor's degree and then enrolls at one of nearly 150 U.S.-based colleges and schools of pharmacy that offer a Doctor of Pharmacy Degree ("PharmD").[7]

---

[5]  Am. Soc'y of Health-System Pharmacists, *ASHP Meetings and Events Terms and Conditions*, (last visited June 24, 2025), https://www.ashp.org/meetings-and-conferences/ashp-meetings-and-events-terms-and-conditions?loginreturnUrl=SSOCheckOnly#; *see* Am. Soc'y of Health-System Pharmacists, *ASHP Midyear Clinical Meeting & Exhibition*, (last visited June 24, 2025), https://s23.a2zinc.net/clients/ASHP/PPS2024/Public/EventMap.aspx?shMode=E.

[6]  Am. Soc'y of Health-System Pharmacists, *ASHP Meetings and Events Terms and Conditions*, (last visited June 24, 2025), https://www.ashp.org/meetings-and-conferences/ashp-meetings-and-events-terms-and-conditions?loginreturnUrl=SSOCheckOnly#.

[7]  Pharmacists are not medical doctors. Individuals seeking to become pharmacists attend colleges of pharmacy rather than medical schools. Colleges of pharmacy do not train physicians, and their graduates receive Doctor of Pharmacy degrees rather than medical degrees (*e.g.,* Doctor of Medicine or Doctor of Osteopathic Medicine). At each university in the country that operates both a college of pharmacy and a medical school, the administration, curriculum, instructors, student body, and clinical programs of the college of pharmacy are separate and distinct from those of the medical school. Colleges of pharmacy are accredited solely by the Accreditation Counsel for Pharmacy Education, not the Liaison Committee on Medical Education, which accredits medical schools.

42.     PharmD graduates must pass the North American Pharmacist Licensure Examination before they are allowed to practice in the United States.  State boards of pharmacy specify additional licensure requirements.

43.     Students with a PharmD can find work as a pharmacist immediately after graduation in sectors such as retail (e.g., dispensing medicine at a CVS Pharmacy) and manufacturing (*e.g.,* working for pharmaceutical manufacturers in creating medicines).  In 2023, the mean wage for pharmacists was $134,790.[8]

44.     However, some PharmD graduates decide to pursue a different course of employment in a pharmacy residency.  A pharmacy residency is a one-year employment program. Pharmacy residency programs usually involve training in a hospital or similar treatment facility where pharmacy residents work in "rotations," providing direct patient care under the supervision of a more senior pharmacist.

45.     Pharmacy residents work notoriously long hours.  This problem is so prevalent that the ASHP has imposed "duty hour requirements" that cap total hours of work per week (80 hours per week), hours of continuous duty (16 hours), and require at least one period of 8 hours of "duty-free time" per seven days of duty.  Yet, despite these rules, the hours remain demanding, averaging 50 to 60 hours per week, despite making less than half of the average pharmacist's salary.[9]  One former pharmacy resident noted that "[s]ome programs require night shifts, on-call status, five case presentations instead of three, and the list continues."  Noting her personal experience in a post graduate year ("PGY")-1 residency, a former pharmacy resident recalled times when she averaged

---

[8]      U.S. Bureau of Labor Statistics, Occupational Employment and Wages, May 2023; 29-1051 Pharmacists, available at https://www.bls.gov/oes/2023/may/oes291051.htm (last accessed March 8, 2025).
[9]      Fraser Sherman, *What Does a Pharmacist Resident Earn?*, https://work.chron.com/pharmacist-resident-earn-23873.html.

twelve hours of work per day across twelve workdays (out of fourteen), with only two days off in that period.[10]

46.     A residency is not required to practice as a pharmacist generally, but a residency is required to obtain certain types of employment as a pharmacist.  For example, various specialized fields of pharmacy (*e.g.*, infectious disease, ambulatory care, emergency medicine, oncology, solid organ transplant, etc.) require a residency.  Obtaining a job as a pharmacist in a hospital or other clinical setting also typically requires a residency.  The same is true for instructional positions at colleges of pharmacy and in pharmacy residency programs.

47.     Some pharmacists undertake two residencies.  A pharmacist's first residency is referred to as "PGY-1."  A pharmacist's second residency is referred to as "PGY-2."  Gaining employment in a PGY-2 program requires completion of a PGY-1 program.

48.     Board certification is available for pharmacists in certain specialty areas, and completing a residency accelerates a pharmacist's eligibility for the certification exams.  One requirement to qualify for the board exams is either at least one year of residency experience or more than three years of practical experience.

49.     Pharmacy residencies therefore open considerable new opportunities and career pathways for licensed pharmacists.  Unfortunately for PharmD graduates, however, the market for employment of pharmacy residents is restrained by an anticompetitive conspiracy between virtually every employer of pharmacy residents, as orchestrated by Defendants ASHP and NMS.

## II.    ASHP Resident Matching Program

50.     The ASHP Match operates as an anticompetitive conspiracy.  Defendant ASHP coordinates that conspiracy by, among other things, sponsoring the ASHP Match, establishing the

---

[10]     Kristen Lindauer, PharmD, BCPS, AAHIVP, *Pharmacy Resident: A Day in the Life*, (last visited June 26, 2025), https://www.rxteach.com/day-in-the-life-of-a-pharmacy-resident/.

rules that govern the ASHP Match, regulating the residency programs that participate in the ASHP Match, and policing compliance with the rules of the ASHP Match.

51.     Defendant ASHP sponsors, operates, and administers the ASHP Match from and within its headquarters located in Bethesda, Maryland.

52.     Defendant ASHP is the sole nationally-recognized body for accreditation of pharmacy residencies, and each of the Employer Defendants' pharmacy residency programs is accredited by Defendant ASHP.[11] .

53.     Defendant ASHP requires every accredited pharmacy residency program to offer all residency positions exclusively through the ASHP Match, subject to very limited exceptions.

54.     Pharmacists wishing to apply for employment with an accredited residency program must do so through the ASHP Match.  To register for the ASHP Match, prospective pharmacy residents submit applications using Defendant ASHP's portal, the Pharmacy Online Residency Centralized Application Service ("PHORCAS").  In this system, the applicants rank the pharmacy programs where they wish to obtain employment from most desirable to least desirable. These ranked selections are referred to as a "Rank Order List."

55.     Defendant ASHP requires both the residency programs and pharmacists participating in the ASHP Match to agree to rules which restrain competition for the employment of pharmacy residents.

56.     Defendant ASHP contracts with Defendant NMS to administer the ASHP Match. Residency programs wishing to participate in the ASHP Match must register on a website operated

---

[11]     ASHP, *How to Start a Residency Program*, 4 (2015) (stating "Accreditation of pharmacy residencies is currently provided exclusively by ASHP through their Commission on Credentialing.").

by Defendant NMS (https://natmatch.com/ashprmp/).  Using this website, the programs rank the applicants they wish to employ.  They then submit their Rank Order List to Defendant NMS.

57.     Defendant NMS receives the Rank Order Lists from both the applicants and the residency programs.  It then runs an algorithm over the aggregated Rank Order Lists.  The results of the algorithm determine which applicants are matched to which residency programs.

58.     The results of the ASHP Match are contractually binding upon both the residency programs and the pharmacist applicants.  Defendant ASHP imposes penalties on any ASHP Match participant who does not accept the placements generated by the ASHP Match.  Defendant ASHP has banned applicants from participating in the ASHP Match for not accepting employment at the residency program to which they were assigned by the ASHP Match.

59.     The requirements and rules governing the relationships between the individual and entities involved in the ASHP Match are formalized in a series of agreements as described below.

**A.      ASHP Regulations on Accreditation of Pharmacy Residencies**

60.     Defendant ASHP plays a central role in the ASHP Match.  ASHP recruits new members into the conspiracy through its accreditation program and associated regulations.

61.     Without an ASHP accreditation, pharmacy residency programs struggle to survive. They attract fewer and less competitive applicants, and their participants enjoy fewer reputational and career benefits than pharmacists who work for an accredited program.  Fewer than ten percent of pharmacy residency positions nationwide are not accredited by ASHP.

62.     As a condition of acquiring ASHP accreditation, residency programs must adhere to the ASHP Regulations on Accreditation of Pharmacy Residencies (the "ASHP Accreditation Regulations").  A copy of the ASHP Accreditation Regulations adopted by the ASHP Board of Directors on September 20, 2024, is attached as **Exhibit A**.  The provisions of the ASHP

Accreditation Regulations discussed in this Complaint, as presented in **Exhibit A**, were substantively and materially the same at all relevant times.

63.    Regulation XI(D) of the ASHP Accreditation Regulations provides that "All postgraduate year one and postgraduate year two residency programs in pre-candidate, candidate, conditional accreditation, or accredited status must participate in the Resident Matching Program conducted by ASHP, unless exempted by the COC [Commission on Credentialing]."

64.    Exceptions to this requirement are rarely granted.  Less than five percent of accredited programs receive an exemption to the requirement that all programs must participate in the ASHP Match.

65.    Regulation XI(D) of the ASHP Accreditation Regulations further states "all residency programs must adhere to the *ASHP Resident Matching Program Residency Agreement* and *Rules for the ASHP Pharmacy Residency Matching Program*" (emphasis added). Defendant ASHP enforces compliance with Regulation XI(D) through its Annual Residency Accreditation Reports and other measures.  Penalties for non-compliance with Regulation XI(D) may include loss of accreditation as specified by Regulation XIV(A)(1).  Defendant ASHP has taken remedial actions against non-compliant residency programs to enforce adherence to the ASHP Accreditation Regulations.

66.    Regulation XIV(A)(6) of the ASHP Accreditation Regulations provides that accreditation may be withdrawn from "An accredited program that is required to participate in the Resident Matching Program and fails to do so."

67.    Each Employer Defendant operates at least one accredited pharmacy residency program and has agreed to be bound by the ASHP Accreditation Regulations.

68.    Each Employer Defendant renews its agreement to be bound by the ASHP Accreditation Regulations each time it renews its residency programs' accreditation with Defendant ASHP.  Accreditations are valid for eight years, then must be renewed.

69.    Each Employer Defendant further renews its agreement to be bound by the ASHP Accreditation Regulations each time the ASHP Board of Directors issues a new version of the ASHP Accreditation Regulations.[12]

70.    The ASHP Board of Directors issued the most recent version of the ASHP Accreditation Regulations on September 20, 2024, which superseded the prior version issued by the ASHP Board of Directors on August 12, 2023.

71.    For example, Defendant Johns Hopkins agreed to be bound by the ASHP Accreditation Regulations as a condition of operating numerous pharmacy residency programs accredited by Defendant ASHP.  Johns Hopkins renewed that agreement each time it re-applied for accreditation of its pharmacy residency programs, and when ASHP issued new versions of the ASHP Accreditation Regulations in 2023 and 2024.  Johns Hopkins did so from within the State of Maryland.

**B.    ASHP Match Program Agreement**

72.    All residency programs participating in the ASHP Match must enter into the American Society of Health-System Pharmacists Resident Matching Program Residency Agreement (the "ASHP Match Program Agreement").  The ASHP Match Program Agreement is attached as **Exhibit B**.[13]

---

[12]    Regulation XIV(A)(1) of the ASHP Accreditation Regulations provides that "In the event that The Standard is revised, all accredited programs will be expected to meet the revised standard within one year."

[13]    The version of the ASHP Match Program Agreement attached as **Exhibit B** applied to residency programs offering positions which commenced between June 1, 2024 and December 31, 2024.  Previous versions in force during the time frame applicable to this action included substantively the same provisions.

73.     Under the ASHP Accreditation Regulations, every residency program accredited by the ASHP must participate in the ASHP Match and agree to the ASHP Match Program Agreement.  *See* ASHP Accreditation Regulation XI(D).

74.     Residency programs in pre-candidate accreditation status and candidate accreditation status may also participate in the ASHP Match provided they first agree to the ASHP Match Program Agreement.

75.     Residency programs enter into the ASHP Match Program Agreement with Defendant ASHP and with one another.  In other words, each Employer Defendant has entered into the ASHP Match Program Agreement with Defendant ASHP, and understands that every other Employer Defendant and every other employer of pharmacy residents which participates in the ASHP Match has similarly entered into the ASHP Match Program Agreement.

76.     Among other provisions, the ASHP Match Program Agreement provides that the "organization, residency and program(s) agree to":

- "Abide by the Rules of the ASHP Pharmacy Resident Matching Program ("ASHP Match Rules") established by ASHP as shown on the Match website (natmatch.com/ashprmp), which are incorporated by reference in and are an integral part of this Agreement."

- "Offer in Phase I of the Match all positions available in the residency . . ."[14]

- "Furthermore, positions left unfilled in Phase I of the Match must be offered in Phase II of the Match, in accordance with ASHP Match Rules."

- "Require no commitment from any applicant and make no offer of appointment to any applicant prior to the release of the results for Phase I of the Match, except for PGY2 [Post-Graduate Year 2 or second-year] residency positions that may be committed to PGY1 [first-year] residents in accordance with the Early Commitment Process."

---

[14]     This requirement exempts "Department of Defense and Public Health Service positions offered exclusively to commissioned pharmacy officers, positions in Indian Health Service residencies, or positions offered in residencies outside of the United States that have been exempted by ASHP."  These positions constitute less than ten percent of the total pharmacy residency positions available in the United States in any given year during the time period applicable to this action.

- "Furthermore, require no commitment from any applicant and make no offer of appointment to any applicant prior to the release of the results for Phase II of the Match for any position that is offered in Phase I but not filled in Phase I or that is added for Phase II of the Match."

- "Offer an appointment to each applicant matched with this residency."

- "Contact each applicant matched with this residency in writing within 30 days of the Match results release date for each Phase of the Match, as specified in the ASHP Match Rules."

- "Not offer a position to any applicant who was matched elsewhere, or committed elsewhere through the Early Commitment Process, and who has not received a written release from the residency program concerned."[15]

77.    The ASHP Match Program Agreement further provides that "Programs must never request ranking information from any applicant, and applicants must never request ranking information from any program.  Prior to the release of the Phase II Match results, neither party (applicant or program) may disclose to the other party any information regarding the positioning of any applicant or program on a Rank Order List."

78.    The ASHP Match Program Agreement also states: "If this organization or residency violates any of the terms of this Agreement or the ASHP Match Rules, such as not offering an appointment to an applicant who has matched with the residency, or offering an appointment to an applicant who has matched to another residency, ASHP may pursue all available remedies and impose penalties on this organization, residency and/or programs(s), including forfeiture of ASHP accreditation status."

79.    The process for entering into the ASHP Match Program Agreement is standardized and routine.  The ASHP Match website explains:

The Residency Program Director of each eligible residency is sent an email with a personalized link and instructions to register their residency for the 2025 Match. If

---

[15]    The "Early Commitment Process" allows organizations or health systems that operate both PGY1 and PGY2 pharmacy residency programs and elect to allow their PGY1 residents to commit to one of the organization's or health system's PGY2 residencies.

you have not received a personalized email to register your residency by August 20, 2024, please contact NMS.

The online registration process must be completed by the Residency Program Director and can be started by clicking on the personalized link in the email sent by NMS.

As part of the registration process, the residency must agree to abide by the terms of the Residency Agreement, the ASHP Match Rules, and the Schedule of Dates.

80.    The Program Registration Guide explains how Residency Program Directors must register their programs for the ASHP Match.  A copy of the Program Registration Guide is attached as **Exhibit C**.[16]  Registering residency programs involves making an account on the website and providing certain information about the residency program.

81.    Under the Program Registration Guide, the fourth mandatory step of registering a residency program for the ASHP Match is to "Accept the Match Agreement and Rules."  The Program Registration Guideline provides: "You must electronically sign the Residency Agreement for the 2025 ASHP Match.  Read the Agreement page carefully, as your organization, residency and program(s) will be committed to abide by the Agreement once it is registered."

82.    Registration emails for participation in the ASHP Match are sent to Residency Program Directors in August each year, as stated in the Schedule of Dates on the ASHP Match website.  By early November each year, the list of programs participating in the ASHP Match becomes publicly available.  Therefore, each Employer Defendant entered into the ASHP Match Program Agreement each year between August and November through the ASHP website.

83.    Defendant NMS invited each Employer Defendant to join the ASHP Match through those personalized emails sent to each Residency Program Director which contained a link to a

---

[16]    Previous versions of the ASHP Match Program Registration Guide in force during the time frame applicable to this action included substantively the same provisions.

website where the residency employer could manifest assent to the ASHP Match Program Agreement.

84.     The ASHP Match Program Agreement specifically binds its signatories to adhere to the rules governing the ASHP Match.  *See* ASHP Match Program Agreement, Clause 2.

### C.     ASHP Match Rules

85.     All residency programs accredited by ASHP, including each Employer Defendant, must agree to abide by the Rules for the ASHP Pharmacy Resident Matching Programs (the "ASHP Match Rules").  *See, e.g.*, ASHP Accreditation Regulations, Regulation XI(D).  The ASHP Match Rules in effect as of August 2024 is attached as **Exhibit D**.[17]

86.     The residency programs participating in the ASHP Match, including each Employer Defendant, agree to the ASHP Match Rules in the same manner by which they agree to the ASHP Match Program Agreement, as the ASHP Match Rules are expressly incorporated into the ASHP Match Program Agreement.  *See* ASHP Match Program Agreement, Clause 2.

87.     Each Employer Defendant has agreed to abide by, and understands that all other Employer Defendants have agreed to abide by, the ASHP Match Rules at the times and in the same manner that they agreed to the ASHP Match Program Agreement.

88.     The ASHP Match Rules are binding upon both residency programs and pharmacists applying for residency positions through the ASHP Match.

89.     The ASHP Match Rules contain the following provisions:

- "All participants shall abide by all deadlines and their agreements for participation in the Match." "Residency program directors must ensure that all people involved in recruiting or selecting residents understand and adhere to these rules."

---

[17]     Previous versions of the ASHP Match Rules in force during the time frame applicable to this action included substantively the same provisions.

- "Violations of these rules or Match agreements by applicants or programs may result in sanctions by ASHP or legal action by other Match participants." "Results of the [ASHP Match] constitute binding agreements between applicants and residency programs that may not be reversed unilaterally by either party."

- "Residency programs that receive their Phase I Match results and have one or more positions left unfilled must offer those positions to applicants in Phase II of the Match."

- "The only information that persons at the residency may communicate to an applicant prior to the release of the results for each Phase of the Match is whether or not the applicant remains under consideration for admission."

- "Applicants may not accept an offer if they have been matched or have already accepted an offer from another residency program."

- "When the program contacts the applicant to confirm the acceptance of the offer, the program must also provide general information about the hiring process including pre-employment requirements."

90.     The ASHP Match Rules further prohibit applicants and residency programs from sharing information about their Rank Order Lists and provide for disciplinary measures to be taken against participants who violate the ASHP Match Rules.

### D.     ASHP Match Applicant Agreement

91.     Under the agreements described above, pharmacists seeking to obtain employment as a pharmacy resident with an accredited residency program must apply through the ASHP Match.

92.     In order to participate in the ASHP Match, pharmacists must agree to the American Society of Health-System Pharmacists Resident Matching Program Applicant Agreement (the "ASHP Match Applicant Agreement").  The ASHP Match Applicant Agreement is attached as **Exhibit E**.[18]

93.     The ASHP Match Applicant Agreement provides that the applicant agrees:

---

[18]     The version of the ASHP Match Applicant Agreement attached as **Exhibit E** applied to applicants seeking positions which began between June 1, 2024 and December 31, 2024.  Previous versions in force during the time frame applicable to this action included substantively the same provisions.

- "To abide by the Rules of the ASHP Pharmacy Resident Matching Program ("ASHP Match Rules") as shown on the Match website (natmatch.com/ashprmp), which are incorporated by reference in and are an integral part of this Agreement."

- "Not to make any commitment to or contract with any program registered for the Match prior to the release of the results for Phase I of the Match, except that if I am currently a PGY1 resident I may commit to a PGY2 residency position that is offered to me in accordance with the Early Commitment Process. Furthermore, if I do not obtain a position in Phase I of the Match or through the Early Commitment Process, I agree not to make any commitment to or contract with any program registered for the Match prior to the release of the results of Phase II of the Match. If I choose to accept a position either at a program that is not registered for the Match or at a registered program in accordance with the Early Commitment Process, or if I decide not to participate in the Match for any other reason, then I will submit a withdrawal from the Match, and will not submit a Rank Order List for the Match."

- "To accept appointment to the program with which I am matched. I cannot avoid accepting appointment to or attending the program with which I am matched without a written release from the program concerned; also, another program registered for the Match cannot offer me a position unless I have this release."

- "**ASHP possesses beneficiary standing to enforce this Agreement, and violations of this Agreement or the ASHP Match Rules will be reported to ASHP.** If I violate any of the terms of this Agreement or the ASHP Match Rules, such as refusing to accept a position at the program with which I have been matched, ASHP may pursue all available remedies, including reporting my actions to my school. Furthermore, ASHP may impose penalties on me, including barring me from participation in future ASHP Resident Matching Programs." (emphasis in original).

94.     Pharmacists may not apply for employment with any accredited residency program without agreeing to the ASHP Match Applicant Agreement.

### III.    Exchange of Resident Compensation Information

95.     Defendants further contract, combine, and conspire to exchange competitively sensitive information regarding the salaries and employment benefits offered to pharmacy residents ("Resident Compensation Information") by each residency program.

96.     Defendant ASHP maintains a "Residency Directory" which contains Resident Compensation Information for every accredited residency program.

97.    The Residency Directory is accessible to every residency program which participates in the ASHP Match.  The Residency Directory lists the salaries offered to residents in each accredited residency program and other employment benefits.

98.    Each Employer Defendant has agreed with one another and with Defendant ASHP to exchange Resident Compensation Information through the Residency Directory.

99.    Additionally, the Employer Defendants and co-conspirators are provided with "Competitiveness Reports" by NMS.  NMS says these reports "provide programs with insights into their desirability, the quality of their applicant pool, and the effectiveness of their evaluations. The reports are customized for each program and provide comparisons to a peer group and the overall market."[19]  Through these reports, the Employer Defendants can compare the competitive features of their respective programs.

100.    Further, ASHP also regularly conducts surveys of residency programs. The ASHP Accreditation Regulations require all programs to "adhere to the following mandatory surveys conducted by the McCreadie Group, Inc., on behalf of the ASHP and delivered through PharmAcademic™."  In connection with one of the surveys, "some information collected is aggregated to identify trends and shared with the pharmacy community and external agencies/partners."  *See* ASHP Accreditation Regulation XI(F).

101.    Each Employer Defendant has renewed its agreement with one another and with Defendant ASHP to exchange Resident Compensation Information in the same manner and at the same time that they agreed to (1) participate in the ASHP Match each year and (2) become accredited or renew their residency program's accreditation with ASHP.

---

[19]    NMS, *Recent News*, https://natmatch.com/news.html (last accessed June 12, 2025)

102.    The exchange of Resident Compensation Information allows each Employer Defendant to suppress pharmacy resident compensation and to monitor and police compliance with the conspiracy.

### IV.    Demand-Side Controls

103.    Defendants' conspiracy also limits and controls the number of residency positions available to applicants and specifically keeps the number of residency positions available in any given year well below the number of applicants entering the ASHP Match.

104.    In doing so, Defendants intentionally manage the demand side of the relevant market defined below and ensure a surplus of labor, which has the purpose and effect of suppressing the compensation of resident pharmacists.

105.    Demand for pharmacists with residency training has been increasing since at least 2013.  Data maintained by the Bureau of Labor Statistics show that the number of hospital pharmacists has steadily increased each year since 2013.[20]  Hospital pharmacists are a useful proxy for overall demand for residency-trained pharmacists because pharmacists employed by hospitals typically have completed a residency.

106.    Against this backdrop, in every year from 2013 to 2024, the number of pharmacists applying for positions in the ASHP Match has exceeded the number of residency positions available.  In a normal competitive market where demand for residency-trained pharmacists was increasing, one would expect that the number of ASHP positions offered and number of ASHP matches should have been increasing.  But rather than this expected outcome, the number of ASHP matches and residency positions offered were either stabilizing or declining, relative to the growth in demand for residency-trained pharmacists.

---

[20]    U.S. Bureau of Labor Statistics, Occupational Employment and Wage Statistics (OEWS) Tables, https://www.bls.gov/oes/tables.htm.

107.    ASHP has resisted the expansion of the number of available residency positions to remain well-below supply of applicants, regardless of external market factors.

108.    This has been documented.  In 2023, an article in the American Journal of Pharmaceutical Education reported:

> In 2019, a majority of American Society of Health-System Pharmacists (ASHP) Pharmacy Forecast Panelists predicted that nearly all health-systems would require a postgraduate year 1 (PGY1) residency for entry-level pharmacist positions. Despite these endorsements, as well as the declines in residency applications and unmatched applicants since 2020, there remains an annual surplus of graduates seeking PGY1 residency training compared to positions available within the ASHP Resident Matching Program.[21]

109.    Similarly, a 2022 article in the American Journal of Health-System Pharmacy analyzed trends in pharmacy residencies and wrote:

> Required residency training for direct patient care has been persistently predicted by various pharmacy organizations since 2006. ASHP-accredited PGY2 program growth rates appear slower than predicted, as the number of available positions do not match the number of applicants. In 2021, 25% of PGY2 residency applicants participating in the match did not obtain a position.[22]

110.    Defendants carry out this element of the conspiracy in part through the ASHP Match, which requires each program participant to list on the Residency Directory the number of residency positions it has available.  This is a key competitive metric that allows Defendants to anticipate total industry volume of residency positions and ensure that number does not exceed projected applications.

111.    ASHP's public statements also confirm their explicit goal of controlling the demand for pharmacy residents through the ASHP Match, which they seek to impose upon all pharmacy graduates:

---

[21]    Christina L. Mnatzaganian et al., *Influence on the Number, Timing, and Types of Advanced Pharmacy Practice Experiences on Residency Matching*, 87 AM. J. OF PHARM. ED. (2023).

[22]    Drew Lambert et al., *Trends in postgraduate year 2 pharmacy residencies*, AM. J. HEALTH-SYST. PHARM. 2022;79:1369-1375.

Workforce outlook and educational debt have decreased admission applications and class size in schools and colleges of pharmacy. During the past 15 years, the historical pharmacist shortage has transitioned into oversupply.

The number of pharmacy graduates will decline in the next 5 years, which may recalibrate supply and demand. Alignment with the number of graduates with residency availability could accelerate ASHP's goal to ensure new pharmacy practitioners complete post-graduate training as a minimum credential.[23]

112.    As a result of this control of the demand side of the relevant market defined below, Defendants artificially maintain an excess supply of labor above the level of labor demand.

113.    This demand-side management has the purpose and effect of reducing competition between employers for pharmacy residents and thereby suppressing the compensation paid to pharmacy residents.

## V.    Anticompetitive Effects

114.    The restraints on trade embodied in the conspiracy described above have anticompetitive effects on the market for the employment of pharmacy residents in the United States.

115.    The ASHP Match restrains trade in the market for the employment of pharmacy residents in the United States in the following ways, among others:

- Prohibiting pharmacists from applying for accredited residency positions outside of the ASHP Match.

- Prohibiting accredited residency positions from accepting applications for pharmacy residency positions outside of the ASHP Match.

- Requiring pharmacists to accept employment with the residency program to which they are assigned by the ASHP Match.

- Requiring ASHP Match applicants to agree to accept employment with the residency program to which they are matched before they have an opportunity to negotiate the terms of their employment.

- Prohibiting residency programs participating in the ASHP Match from communicating with pharmacists applying for employment through the ASHP

---

[23]    ASHP, *Pharmacy Forecast 2021: Strategic Planning Guidance for Pharmacy Departments in Hospitals and Health Systems*, 78 Am. J. Health-Syst. Pharm. 6:497 (March 15, 2021).

Match about any subject besides whether they are still under consideration for the program.

- Prohibiting pharmacists from transferring between residency programs.
- Prohibiting pharmacists from applying for residency programs at times outside of the specific dates established by the ASHP Match.

116.    Defendant ASHP publishes a guide, "How to Start a Residency Program."[24]  This guide is explicit in its promise that participation in the ASHP will reduce the employer's labor costs, stating: "Splitting one pharmacist position into two residency positions will usually yield leftover dollars."

117.    Defendants further restrain trade in the market for the employment of pharmacy residents by conspiring to exchange Resident Compensation Information and conspiring to control the demand side of the market by controlling the number of residency positions available.

118.    The anticompetitive effects of these restraints are demonstrated by the difference in wages received by pharmacy residents and pharmacists generally, which include those who do not pursue a residency.  As shown in Figure 2, pharmacy resident wages (Indexed ASHP Median) have grown at substantially lower rates relative to the median wage growth across all pharmacists.

---

[24]    ASHP, *How to Start a Residency Program*, https://www.ashp.org/-/media/assets/professional-development/residencies/docs/how-to-start-residency-what-you-really-need-to-know.pdf.

**Figure 2. ASHP Median Wage Growth v. Median All Pharmacists Wage Growth (Index=100 in 2017)[25]**



119.     Even comparing pharmacy residents' wages to the wages on the lower-end of the pharmacist wage distribution—which would include many pharmacists who, like pharmacy residents, are early in their careers—shows that ASHP wages are significantly lower than the wages that prevail outside of the ASHP Match.

120.     The following charts focus on the 10th percentile of the pharmacist wage distribution.[26]  Because residents' wages in the following charts are being compared to wages of pharmacists with similar levels of experience and tenure, the comparison can be done in dollar terms, rather than using indices.

121.     Figure 1 (shown above) presents the median ASHP wage each year (green bars) against the 10th percentile for all pharmacist wages in the United States (blue bars).  As shown in the chart, ASHP median wages are substantially below the 10th percentile for all pharmacist wages.

[25]      U.S. Bureau of Labor Statistics, Occupational Employment and Wage Statistics (OEWS) Tables, https://www.bls.gov/oes/tables.htm; ASHP Data.
[26]      The 10th percentile is the salary above which 90% of pharmacists are paid and below which the remaining 10% are paid. The BLS maintains data at each of the 90th, 75th, 50th (*i.e.*, median), 25th, and 10th percentiles. The BLS does not break out salaries by years of experience and as a result, the 10th percentile represents the closest comparator to ASHP residents in terms of likely experience and tenure.

**Figure 1. ASHP Median Wage v. 10th Percentile of All Pharmacist Wages**[27]



122.     These results hold even when broken down by different segments.  Figure 3 below presents the median pharmacy resident wage each year (green bars) against the 10th percentile for pharmacist wages in hospitals (purple bars).  Between 2017 and 2024, ASHP wages were lower than the 10th percentile of hospital pharmacist wages by between $47,000 and $64,000.

---

[27]     U.S. Bureau of Labor Statistics, Occupational Employment and Wage Statistics (OEWS) Tables, https://www.bls.gov/oes/tables.htm; ASHP Data.  Even when comparing the 90th percentile of ASHP wages to the 10th percentile of all pharmacists wages, there is difference of at least $10,000.

**Figure 3. ASHP Median Wage v. 10th Percentile of Hospital Pharmacist Wages**[28]



123.    Figure 4 presents the median pharmacy resident wage each year (green bars) against the 10th percentile in ambulatory healthcare services (yellow bars).  Between 2017 and 2024, ASHP pharmacy resident wages were lower than the 10th percentile of pharmacist salaries in ambulatory healthcare services by between $47,000 and $63,000.

---

[28]     U.S. Bureau of Labor Statistics, Occupational Employment and Wage Statistics (OEWS) Tables, https://www.bls.gov/oes/tables.htm; ASHP Data.

**Figure 4. ASHP Wage v. 10th Percentile of Ambulatory Healthcare Services Pharmacist Wages[29]**



124.    Figure 5 presents the median pharmacy resident wage each year (green bars) against the 10th percentile in pharmacist wages in general merchandise retailers (gray bars).  Between 2017 and 2024, ASHP pharmacy resident wages were lower than the 10th percentile of pharmacist wages in general merchandise retailers by between $37,000 and $48,000.

---

[29]    U.S. Bureau of Labor Statistics, Occupational Employment and Wage Statistics (OEWS) Tables, https://www.bls.gov/oes/tables.htm; ASHP Data.

**Figure 5: ASHP Median Wages v. 10th Percentile of General Merchandise Retailer Pharmacist Wages[30]**



125.    Pharmacy residents also have fewer and inferior employment benefits than non-resident pharmacists with the same level of experience.  These include more expensive and inferior health insurance, retirement benefits, and life insurance plans.

126.    As explained above, pharmacy residents also work longer hours on average than non-resident pharmacists with the same level of experience, despite being paid substantially less than non-residency pharmacists and receiving other inferior employment benefits.

127.    Each Plaintiff and Class member has been directly and proximately harmed by suffering suppressed compensation for their employment as a pharmacy resident because of the anticompetitive restraints imposed by Defendants.

## VI.    Market Definition

128.    ***The Relevant Labor Market.*** To the extent a relevant market needs to be defined, there is a distinct relevant market for the employment of pharmacy residents in the United States (the "Relevant Labor Market").  The residency programs, including each of the Employer

---

[30]      U.S. Bureau of Labor Statistics, Occupational Employment and Wage Statistics (OEWS) Tables, https://www.bls.gov/oes/tables.htm; ASHP Data.

Defendants, are the buyers in the Relevant Labor Market. The Relevant Labor Market is distinct, stable, and insulated from price fluctuations in potential substitute markets.

129.    Pharmacists continue to apply for residency positions in the Relevant Labor Market despite the dramatically lower salaries and inferior benefits than those offered in other potential employment markets for pharmacists because there are distinct qualities associated with the Relevant Labor Market.

130.    The distinct qualities of the Relevant Labor Market include:  (1) increased clinical training; (2) reputational enhancements; (3) the ability to obtain later employment which requires participation in the Relevant Labor Market; and (4) the ability to take the board of pharmacy exams after one year of participating in the Relevant Labor Market compared to three years in potential substitute markets.

131.    Pharmacy residency programs are separate and distinct from any post-medical school residency programs designed for physicians.  The structure of pharmacy residency programs differs significantly from post-graduate positions for physicians.  Following graduation from medical school, physicians must complete an "internship" followed by a "residency" to become fully licensed.  Some physicians may complete an additional "fellowship" program, which provides more advanced training.  The ASHP Match program does not place pharmacists into fellowships, nor does it provide matching services to pharmacy fellowship programs seeking applicants.  Further, there are no post-graduate "internships" in the pharmacy field akin to the internships undertaken by physicians.

132.    Unaccredited residency programs are also not economic substitutes for accredited residency programs.  ASHP accreditation is a de facto requirement for residency programs.  Less than 10% of all pharmacy residency positions are offered by unaccredited employers.

Consequently, pharmacy residency programs without ASHP accreditation are less desirable to pharmacy school graduates than pharmacy residency programs with ASHP accreditation.

133.    General or retail pharmacy positions are also not economic substitutes for accredited residency programs.  Residency experience is required to obtain certain types of employment as a pharmacist.  As noted above, pharmacists can only obtain positions in various specialized fields of pharmacy (*e.g.,* infectious disease, ambulatory care, emergency medicine, oncology, and solid organ transplant) after finishing a residency.  Obtaining a job as a pharmacist in a hospital or other clinical setting typically requires residency experience.  The same is true for instructional positions at colleges of pharmacy.  Non-residency pharmacy employment does not provide a pathway to those other, more specialized employment.

134.    The Relevant Labor Market is stable.  From 2015 to 2024, the number of residency positions available in the Relevant Labor Market rose slightly from about 4,000 to about 5,000.  In each of those years, more pharmacists applied for positions through the ASHP Match than there were positions available.

135.    The Relevant Labor Market is insulated from price fluctuations in potential substitute markets.  A small but significant non-transitory decrease (*e.g.,* 5% over a period of one year) in the salaries of non-resident pharmacists would not cause a substantial decline in the number of applicants seeking employment in the Relevant Labor Market.

136.    ***The Relevant Geographic Market.*** The geographic market for the employment of resident pharmacists is the United States.

137.    The accreditation standards for colleges of pharmacy conferring PharmD degrees is standardized across the United States by the Accreditation Council for Pharmacy Education.

138.    The accreditation standards for pharmacy residency programs are standardized throughout the United States by Defendant ASHP.

139.    The ASHP Match operates only within the geographic boundaries of the United States.

140.    To obtain a pharmacy license, pharmacists across the United States must take the North American Pharmacist Licensure Exam.

141.    State boards of pharmacy licensure maintain reciprocity programs which permit license-holders in one state to obtain licensure in another state on an expedited basis.

142.    Pharmacists seeking employment as residents regularly move across the country and between states and geographic regions to obtain that employment.

## VI.    Defendants Possess Monopsony Power

143.    Defendants, by and through the conspiracy described in this Complaint, have market power in the relevant market.

144.    In 2024, 5,232 residency positions were offered exclusively through the ASHP Match.  That number has gradually increased from 4,940 residency positions offered through the ASHP Match in 2021.

145.    Upon information and belief, fewer than 100 residency positions in unaccredited (including programs in pre-candidate and candidate accreditation statuses) pharmacy residency programs were offered nationwide during each of the years applicable to this action.

146.    Upon information and belief, fewer than 100 accredited residency positions in residency programs were exempted from participation in the ASHP Match.[31]

---

[31]    The vast majority of accredited programs exempt from participation in the ASHP Match are offered through the Commissioned Corps of the U.S. Public Health Service, including positions offered in the Indian Health Service.

147.    Defendants have exercised monopsony power in the relevant market through the operation of their conspiracy.

## CLASS ACTION ALLEGATIONS

148.    Pursuant to Federal Rules of Civil Procedure 23(b)(1), 23(b)(2), 23(b)(3), and where applicable, 23(c)(4), Plaintiffs bring this action on behalf of themselves and members of "Class" defined below:

> All natural persons in the United States who, at any time between February 28, 2021, and the date of class certification (The "Class Period"), were employed as resident pharmacists in positions obtained through the ASHP Match.

> Excluded from the Class are Defendants' officers and directors; any entity in which any Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendants.  Also excluded from the Class are members of the judiciary to whom this case is assigned, their families, and members of their staff.

149.    The Class is so numerous that joinder is impracticable.  Plaintiffs are informed and believe that there are thousands of Class members.  The precise number of members of the Class and their identities are unknown to Plaintiffs at this time but will be readily determined in discovery, including by reference to Defendants' records.

150.    Plaintiffs' claims are typical of the claims the Class members they seek to represent in that Plaintiffs and all Class members were injured and sustained damages by Defendants' uniform wrongful conduct—namely, Defendants' entry into a conspiracy in restraint of trade in the Relevant Market which has suppressed the compensation received by Class members for their labor as pharmacy residents.

151.    Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual members.  Legal and factual questions common to the Class include, but are not limited to:

a.    Whether Defendants engaged in the alleged conduct;

36

     b.   Whether the relevant market, to the extent required to be defined, is properly defined and that Defendants have monopsony power in that market;

     c.   Whether the restraints on trade described herein have anticompetitive effects;

     d.   Whether compensation for pharmacy residents and other terms of employment have been suppressed at a level below those which would prevail in a competitive market;

     e.   Whether Defendants have illegally contracted, combined, and conspired to control the number of pharmacy residency programs in order to illegally create a labor surplus;

     f.   The amount of damages suffered by Class members caused by Defendants' illegal restraints; and

     g.   Whether Class members are entitled to equitable relief, including injunctive relief.

152.    Plaintiffs are adequate representatives of the Class because Plaintiffs' interests do not conflict with the interests of the other members of the Class they seek to represent, they have retained competent counsel experienced in antitrust matters and prosecuting class actions, and they intend to prosecute this action vigorously.  The interests of the members of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

153.    The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class member.  Each Class member lacks the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents the potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability.

## FIRST CLAIM FOR RELIEF
### Agreements in Restraint of Trade
### Violation of Section 1 of the Sherman Act, 15 U.S.C. §1
### (Against All Defendants)

154.    Plaintiffs incorporate and repeat the allegations above.

155.    In violation of 15 U.S.C. §1, Defendants and their co-conspirators have agreed, between and among themselves to restrain competition in the Relevant Labor Market.  Defendants illegally restrain competition in several related ways, including but not limited to:

- Requiring all applicants to accredited pharmacy residency programs to apply through the ASHP Match;

- Requiring ASHP Match applicants to agree to accept employment with the residency program to which they are matched before they have an opportunity to negotiate the terms of their employment;

- Prohibiting residency programs participating in the ASHP Match from communicating with pharmacists applying for employment through the ASHP Match about any subject besides whether they are still under consideration for the program;

- Prohibiting pharmacists from transferring between residency programs;

- Prohibiting pharmacists from applying for residency programs at times outside of the specific dates established by the ASHP Match; and

- Controlling demand side of the Relevant Market by limiting the number of residency positions available to ensure that there is always a substantial excess of applicants applying for limited positions.

156.    The illegal restraints alleged in this Complaint have the purpose and effect artificially suppressing resident pharmacist compensation and manipulating other terms of employment.

157.    The restraints on competition alleged in this Complaint are *per se* illegal under the Sherman Act.

158.    The Employer Defendants are horizontal competitors in the Relevant Market.

159.    Alternatively, the restraints on competition alleged in this Complaint are illegal under either a "quick look" or rule of reason analysis because they are facially anticompetitive

with no valid procompetitive justifications.  Moreover, even if there were valid justifications, they could have been reasonably achieved through means less restrictive of competition.

160.    Each Defendant has participated in one or more overt acts in furtherance of the conspiracy and has participated in the conspiratorial activities described in this Complaint.

161.    Plaintiffs and Class members were injured by the illegal restraints alleged in this Complaint.  Among other things, Plaintiffs and the members of the Class were compensated substantially less than they would have been in the absence of the illegal restraints.  Plaintiffs and each member of the Class have sustained substantial losses and damages to their business and property due to the illegal restraints.

162.    Accordingly, Defendants' conduct should be declared unlawful and Plaintiffs and members of Class are entitled to damages, trebled, and an injunction.[32]

**SECOND CLAIM FOR RELIEF**
**Exchange of Competitively-Sensitive Information**
**Violation of Section 1 of the Sherman Act, 15 U.S.C. §1**
**(Against All Defendants)**

163.    Plaintiffs incorporate and repeat the allegations above.

164.    In violation of 15 U.S.C. §1, Defendants have agreed between and among themselves to restrain competition in the Relevant Market by exchanging Resident Compensation Information.  Each Defendant has participated in one or more overt acts in furtherance of this information exchange, including the provision of salary and benefit information.

165.    This information exchange has been undertaken in furtherance of a price suppression agreement, which is unlawful *per se*.

166.    Defendants' information exchange is also unlawful under either a "quick look" or rule of reason analysis because the exchange is facially anticompetitive with no valid

---

[32]    As to UC Health, Plaintiffs only seek declaratory and injunctive relief.

procompetitive justifications.  Moreover, even if there were valid justifications, they could have been reasonably achieved through means less restrictive of competition.

167.    Plaintiffs and Class members were injured by the information exchange because they were compensated substantially less than they would have been in the absence of the information exchange.  Accordingly, Defendants' conduct should be declared unlawful and Plaintiffs and members of Class are entitled to damages, trebled, and an injunction.[33]

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seek a judgment against Defendants, individually and on behalf of the members of the Class, as follows:

A.    For an order certifying the Class pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), (b)(3), or where applicable, (c)(4), and naming Plaintiffs as representatives of the Class and Plaintiffs' undersigned attorneys as counsel to represent the Class;

B.    For an order declaring Defendants' conduct unlawful under Section 1 of the Sherman Act and enjoining all aspects of Defendants' continuing violation of Section 1 of the Sherman Act pursuant to 15 U.S.C. §26;

C.    For an order entering judgment in favor of Plaintiffs and Class members against Defendants on the claim for relief stated in this Complaint;

D.    For an order awarding Plaintiffs and the Class three times their actual damages against Defendants (except UC Health), jointly and severally, for their violation of 15 U.S.C. §1;

E.    For an order awarding pre- and post-judgment interest; and

F.    For an award of attorneys' fees, costs and expenses to Plaintiffs' counsel.

---

[33]    As to UC Health, Plaintiffs only seek declaratory and injunctive relief.

## DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and members of the Class, hereby demand a trial by jury

pursuant to Federal Rule of Civil Procedure 38(b) on all claims and issues so triable.

Dated: June 30, 2025                         Respectfully submitted,

/s/ Stuart A. Berman
Stuart A. Berman #08489
Stanley J. Reed #00315
**LERCH, EARLY & BREWER, CHTD.**
7600 Wisconsin Avenue, Suite 700
Bethesda, MD 20814
Telephone: (301) 657-0729
saberman@lerchearly.com
sjreed@lerchearly.com

*Interim Liaison Counsel for the Proposed Class*

Frank S. Hedin (*pro hac vice*)
**HEDIN LLP**
1395 Brickell Avenue, Suite 610
Miami, Florida 33131
Telephone: (305) 357-2107
fhedin@hedinllp.com

Tyler K. Somes (*pro hac vice*)
**HEDIN LLP**
1100 15th Street NW, Ste 04-108
Washington, D.C. 20005
Telephone: (202) 900-3331
tsomes@hedinllp.com

Matthew J. Perez (*pro hac vice*)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 24th Floor
Telephone: (212) 233-6444
Facsimile: (212) 223-6334
matt.perez@scott-scott.com

Patrick McGahan (*pro hac vice*)
Erin Dennehy (*pro hac vice forthcoming*)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
156 South Main Street

P.O. Box 192
Colchester, CT 06145
Telephone: (860) 537-5537
Facsimile: (860) 537-4432
pmcgahan@scott-scott.com
edennehy@scott-scott.com

Carmen Medici (*pro hac vice*)
Joseph Pettigrew (MD Bar No. 1812120130)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 233-4565
Facsimile: (619) 233-4565
cmedici@scott-scott.com
jpettigrew@scott-scott.com

*Interim Co-Lead Counsel for the Proposed Class*

Daniel E. Gustafson
Michelle J. Looby
Anthony J. Stauber
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 So. Sixth Street, Suite 2600 Minneapolis, MN
55402
Tel: (612) 333-8844
Fax: (612) 339-6622
dgustafson@gustafsongluek.com
mlooby@gustafsongluek.com
tstauber@gustafsongluek.com

Christopher V. Le
**BOIESBATTIN LLP**
4041 University Drive, 5th Floor
Fairfax, VA 22030
Tel: (703) 764-8700
Fax: (703) 764-8704
cle@boiesbattin.com

Dianne M. Nast
Michele S. Burkholder
Joanne E. Matusko
Michael S. Tarringer
**NASTLAW LLC**
1101 Market Street, Suite 2801

Philadelphia, PA 19107
Telephone: (215) 923-9300
Fax: (215) 923-9302
dnast@nastlaw.com
mburkholder@nastlaw.com
jmatusko@nastlaw.com
mtarringer@nastlaw.com

*Additional Counsel for Plaintiffs and the Proposed Class*